# NATIONAL LEAGUE OF CITIES ET AL. *v.* USERY, SECRETARY OF LABOR

No. 74–878. Argued April 16, 1975—Reargued March 2, 1976—Decided June 24, 1976*

---

*Together with No. 74–879, *California* v. *Usery, Secretary of Labor,* also on appeal from the same court.

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 856. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 856. STEVENS, J., filed a dissenting opinion, *post*, p. 880.

*Charles S. Rhyne* and *Calvin L. Rampton* argued the cause for appellants in both cases on reargument. *Mr. Rhyne* argued the cause for appellants in No. 74–878, and *Talmadge R. Jones,* Deputy Attorney General of California, argued the cause for appellant in No. 74–879 on the original argument. With *Mr. Rhyne* on the briefs in the original argument were *Milton H. Sitton, Alan Davidson, Richard Gebelein,* State Solicitor of Delaware, and the Attorneys General for their respective States as follows: *Bruce E. Babbitt* of Arizona, *Theodore L. Sendak* of Indiana, *Richard C. Turner* of Iowa, *Francis B. Burch* of Maryland, *Francis X. Bellotti* of Massachusetts, *A. F. Summer* of Mississippi, *John C. Danforth* of Missouri, *Robert L. Woodahl* of Montana, *Paul L. Douglas* of Nebraska, *Robert List* of Nevada, *Warren B. Rudman* of New Hampshire, *Larry D. Derryberry* of Oklahoma, *R. Lee Johnson* of Oregon, *Daniel R. McLeod* of South Carolina, *William Janklow* of South Dakota, *John L. Hill* of Texas, *Vernon B. Romney* of Utah, and *David B. Kennedy* of Wyoming. With *Mr. Jones* on the brief in the original argument were *Evelle J. Younger,* Attorney General of California, and *Willard A. Shank,* Assistant Attorney General. With *Mr. Rhyne* on the brief on reargument in both cases were all of the above-named counsel. *Francis B. Burch,* Attorney General of Maryland, *Henry R. Lord,* Deputy Attorney General, and *Glenn E. Bushel,* Assistant Attorney General, filed a brief for appellant in No. 74–878.

*Solicitor General Bork* reargued the cause for appellee in both cases. With him on the briefs on reargu-

ment was *Jacob I. Karro*. With him on the brief on the original argument were *Allan Abbot Tuttle* and *Mr. Karro*.†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Nearly 40 years ago Congress enacted the Fair Labor Standards Act,[1] and required employers covered by the Act to pay their employees a minimum hourly wage [2] and to pay them at one and one-half times their regular

---

†Briefs of *amici curiae* urging reversal were filed by *Andrew P. Miller*, Attorney General of Virginia, *Anthony F. Troy*, Deputy Attorney General, *D. Patrick Lacy, Jr.*, Assistant Attorney General, *Louis J. Lefkowitz*, Attorney General of New York, and *C. Flippo Hicks* for the Commonwealth of Virginia et al.; by *Aloysius J. Suchy, P. Eugene Price, Jr., William F. Edwards, Norman A. Palermo, F. Lee Ruck*, and *David E. Engdahl* for the National Association of Counties et al.; and by *Eugene N. Collins, Conard B. Mattox, Jr., Thomas Emmet Walsh, Henry W. Underhill, Jr., N. Alex Bickley, Samuel Gorlick, Aaron A. Wilson, John Dekker, James B. Brennan, W. Bernard Richland, William R. Quinlan, S. G. Johndroe, Jr., J. LaMar Shelley*, and *Robert G. Dixon, Jr.*, for the National Institute of Municipal Law Officers; and by *Sylvester Petro* for the Public Service Research Council.

Briefs of *amici curiae* urging affirmance were filed by *William J. Baxley*, Attorney General of Alabama, *John D. MacFarlane*, Attorney General of Colorado, *Frank J. Kelley*, Attorney General of Michigan, and *Warren R. Spannous*, Attorney General of Minnesota, for the State of Alabama et al.; by *Robert E. Nagle* for Harrison A. Williams, Jr., et al.; by *J. Albert Woll, Laurence Gold, Robert H. Chanin*, and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations; by *Mr. Kaufmann* for the Coalition of American Public Employees; by *Jerome K. Tankel* for the International Conference of Police Assns.; and by *Harry Lewis Michaels* for the Florida Police Benevolent Assn.

[1] The Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. § 201 *et seq.* (1940 ed.).

[2] § 206 (a) (1940 ed.).

rate of pay for hours worked in excess of 40 during a workweek.[3] By this Act covered employers were required to keep certain records to aid in the enforcement of the Act,[4] and to comply with specified child labor standards.[5] This Court unanimously upheld the Act as a valid exercise of congressional authority under the commerce power in *United States* v. *Darby,* 312 U. S. 100 (1941), observing:

> "Whatever their motive and purpose, regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause." *Id.,* at 115.

The original Fair Labor Standards Act passed in 1938 specifically excluded the States and their political subdivisions from its coverage.[6] In 1974, however, Congress enacted the most recent of a series of broadening amendments to the Act. By these amendments Congress has extended the minimum wage and maximum hour provisions to almost all public employees employed by the States and by their various political subdivisions. Appellants in these cases include individual cities and States, the National League of Cities, and the National Governors' Conference;[7] they brought an action in the District

---

[3] § 207 (a)(3) (1940 ed.).

[4] § 211 (c) (1940 ed.).

[5] § 212 (1940 ed.).

[6] Title 29 U. S. C. § 203 (d) (1940 ed.):

" 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State . . . ."

[7] Appellants in No. 74–878 are the National League of Cities, the National Governors' Conference, the States of Arizona, Indiana, Iowa, Maryland, Massachusetts, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, Oklahoma, Oregon, South Carolina, South Dakota, Texas, Utah, Washington, and Wyoming, the Metropolitan Government of Nashville and Davidson County,

Court for the District of Columbia which challenged the validity of the 1974 amendments. They asserted in effect that when Congress sought to apply the Fair Labor Standards Act provisions virtually across the board to employees of state and municipal governments it "infringed a constitutional prohibition" running in favor of the States *as States*. The gist of their complaint was not that the conditions of employment of such public employees were beyond the scope of the commerce power had those employees been employed in the private sector but that the established constitutional doctrine of intergovernmental immunity consistently recognized in a long series of our cases affirmatively prevented the exercise of this authority in the manner which Congress chose in the 1974 amendments.

I

In a series of amendments beginning in 1961 Congress began to extend the provisions of the Fair Labor Standards Act to some types of public employees. The 1961 amendments to the Act [8] extended its coverage to persons who were employed in "enterprises" engaged in commerce or in the production of goods for commerce.[9] And in 1966, with the amendment of the definition of employers under the Act, the exemption heretofore extended to the States and their political subdivisions was

Tenn., and the cities of Cape Girardeau, Mo., Lompoc, Cal., and Salt Lake City, Utah. The appellant in No. 74–879 is the State of California.

In view of the fact that the appellants include sovereign States and their political subdivisions to which application of the 1974 amendments is claimed to be unconstitutional, we need not consider whether the organizational appellants had standing to challenge the Act. See *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 44–45 (1974).

[8] Pub. L. 87–30, 75 Stat. 65.

[9] 29 U. S. C. §§ 203 (r), 203 (s), 206 (b), 207 (a)(2) (1964 ed.).

removed with respect to employees of state hospitals, institutions, and schools.[10]   We nevertheless sustained the validity of the combined effect of these two amendments in *Maryland* v. *Wirtz,* 392 U. S. 183 (1968).

In 1974, Congress again broadened the coverage of the Act, 88 Stat. 55.   The definition of "employer" in the Act now specifically "includes a public agency," 29 U. S. C. § 203 (d) (1970 ed., Supp. IV).   In addition, the critical definition of "[e]nterprise[s] engaged in commerce or in the production of goods for commerce" was expanded to encompass "an activity of a public agency," and goes on to specify that

> "[t]he employees of an enterprise which is a public agency shall for purposes of this subsection be deemed to be employees engaged in commerce, or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce."   29 U. S. C. § 203 (s)(5) (1970 ed., Supp. IV).

Under the amendments "[p]ublic agency" is in turn defined as including

> "the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Rate Commission), a State, or a political subdivision of a State; or any interstate governmental agency."   29 U. S. C. § 203 (x) (1970 ed., Supp. IV).

By its 1974 amendments, then, Congress has now entirely removed the exemption previously afforded States and their political subdivisions, substituting only the Act's general exemption for executive, administrative, or pro-

---

[10] 80 Stat. 831, 29 U. S. C. § 203 (d) (1964 ed., Supp. II).

fessional personnel, 29 U. S. C. § 213 (a)(1), which is supplemented by provisions excluding from the Act's coverage those individuals holding public elective office or serving such an officeholder in one of several specific capacities. 29 U. S. C. § 203 (e)(2)(C) (1970 ed., Supp. IV). The Act thus imposes upon almost all public employment the minimum wage and maximum hour requirements previously restricted to employees engaged in interstate commerce. These requirements are essentially identical to those imposed upon private employers, although the Act does attempt to make some provision for public employment relationships which are without counterpart in the private sector, such as those presented by fire protection and law enforcement personnel. See 29 U. S. C. § 207 (k) (1970 ed., Supp. IV).

Challenging these 1974 amendments in the District Court, appellants sought both declaratory and injunctive relief against the amendments' application to them, and a three-judge court was accordingly convened pursuant to 28 U. S. C. § 2282. That court, after hearing argument on the law from the parties, granted appellee Secretary of Labor's motion to dismiss the complaint for failure to state a claim upon which relief might be granted. The District Court stated it was "troubled" by appellants' contentions that the amendments would intrude upon the States' performance of essential governmental functions. The court went on to say that it considered their contentions

> "substantial and that it may well be that the Supreme Court will feel it appropriate to draw back from the far-reaching implications of [*Maryland* v. *Wirtz, supra*]; but that is a decision that only the Supreme Court can make, and as a Federal district court we feel obliged to apply the Wirtz opinion as it stands." *National League of Cities* v. *Brennan*, 406 F. Supp. 826, 828 (DC 1974).

We noted probable jurisdiction in order to consider the important questions recognized by the District Court. 420 U. S. 906 (1975).[11] We agree with the District Court that the appellants' contentions are substantial. Indeed upon full consideration of the question we have decided that the "far-reaching implications" of *Wirtz* should be overruled, and that the judgment of the District Court must be reversed.

## II

It is established beyond peradventure that the Commerce Clause of Art. I of the Constitution is a grant of plenary authority to Congress. That authority is, in the words of Mr. Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), "the power to regulate; that is, to prescribe the rule by which commerce is to be governed." *Id.,* at 196.

When considering the validity of asserted applications of this power to wholly private activity, the Court has made it clear that

> "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *Fry* v. *United States,* 421 U. S. 542, 547 (1975).

Congressional power over areas of private endeavor, even when its exercise may pre-empt express state-law determinations contrary to the result which has commended itself to the collective wisdom of Congress, has been held to be limited only by the requirement that "the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution." *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241, 262 (1964).

---

[11] When the cases were not decided in October Term, 1974, they were set down for reargument, 421 U. S. 986 (1975).

Appellants in no way challenge these decisions establishing the breadth of authority granted Congress under the commerce power. Their contention, on the contrary, is that when Congress seeks to regulate directly the activities of States as public employers, it transgresses an affirmative limitation on the exercise of its power akin to other commerce power affirmative limitations contained in the Constitution. Congressional enactments which may be fully within the grant of legislative authority contained in the Commerce Clause may nonetheless be invalid because found to offend against the right to trial by jury contained in the Sixth Amendment, *United States* v. *Jackson,* 390 U. S. 570 (1968), or the Due Process Clause of the Fifth Amendment, *Leary* v. *United States,* 395 U. S. 6 (1969). Appellants' essential contention is that the 1974 amendments to the Act, while undoubtedly within the scope of the Commerce Clause, encounter a similar constitutional barrier because they are to be applied directly to the States and subdivisions of States as employers.[12]

---

[12] MR. JUSTICE BRENNAN's dissent intimates, *post,* at 858, that guarantees of individual liberties are the only sort of constitutional restrictions which this Court will enforce as against congressional action. It reasons that "Congress is constituted of representatives in both Senate and House *elected from the States.* . . . Decisions upon the extent of federal intervention under the Commerce Clause into the affairs of the States are in that sense decisions of the States themselves." *Post,* at 876. Precisely what is meant by the phrase "are in that sense decisions of the States themselves" is not entirely clear from this language; it is indisputable that a common constituency of voters elects both a State's Governor and its two United States Senators. It is equally indisputable that since the enactment of the Seventeenth Amendment those Senators are not dependent upon state legislators for their election. But in any event the intimation which this reasoning is used to support is incorrect.

In *Myers* v. *United States,* 272 U. S. 52 (1926), the Court held that Congress could not by law limit the authority of the President

This Court has never doubted that there are limits upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to tax or to regulate commerce which are conferred by Art. I of the Constitution. In *Wirtz*, for example, the Court took care to assure the appellants that it had "ample power to prevent . . . 'the utter destruction of the State as a sovereign political entity,'" which they feared. 392 U. S., at 196. Appellee Secretary in this case, both in his brief and upon oral argument, has agreed that our federal system of government imposes definite limits upon the authority of Congress to regulate the activities of the States as States by means of the commerce power. See, *e. g.,* Brief for Appellee 30–41; Tr. of Oral Arg. 39–43. In *Fry, supra,* the Court recognized that an express declaration of this limitation is found in the Tenth Amendment:

> "While the Tenth Amendment has been characterized as a 'truism,' stating merely that 'all is retained which has not been surrendered,' *United States* v.

---

to remove at will an officer of the Executive Branch appointed by him. In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), the Court held that Congress could not constitutionally require that members of the Federal Elections Commission be appointed by officers of the House of Representatives and of the Senate, and that all such appointments had to be made by the President. In each of these cases, an even stronger argument than that made in the dissent could be made to the effect that since each of these bills had been signed by the President, the very officer who challenged them had consented to their becoming law, and it was therefore no concern of this Court that the law violated the Constitution. Just as the dissent contends that "the States are fully able to protect their own interests . . . ," *post,* at 876, it could have been contended that the President, armed with the mandate of a national constituency and with the veto power, was able to protect *his* own interests. Nonetheless, in both cases the laws were held unconstitutional, because they trenched on the authority of the Executive Branch.

*Darby,* 312 U. S. 100, 124 (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." 421 U. S., at 547 n. 7.

In *New York* v. *United States,* 326 U. S. 572 (1946), Mr. Chief Justice Stone, speaking for four Members of an eight-Member Court [13] in rejecting the proposition that Congress could impose taxes on the States so long as it did so in a nondiscriminatory manner, observed:

"A State may, like a private individual, own real property and receive income. But in view of our former decisions we could hardly say that a general non-discriminatory real estate tax (apportioned), or an income tax laid upon citizens and States alike could be constitutionally applied to the State's capitol, its State-house, its public school houses, public parks, or its revenues from taxes or school lands, even though all real property and all income of the citizen is taxed." *Id.,* at 587–588.[14]

---

[13] In quoting from the separate opinion of Mr. Justice Frankfurter in *New York* v. *United States,* 326 U. S., at 573, MR. JUSTICE BRENNAN fails to add that this opinion attracted only one other adherent. The separate opinion of Mr. Chief Justice Stone, on the other hand, was joined by three other Members of the Court. And the two dissenters advocated a position even more protective of state sovereignty than that advanced by Stone. See *Id.,* at 590–598 (Douglas, J., dissenting).

[14] MR. JUSTICE BRENNAN suggests that "the Chief Justice was addressing not the question of a state sovereignty restraint upon the exercise of the commerce power, but rather the principle of implied immunity of the States and Federal Government from taxation by the other . . . ." *Post,* at 863–864. The asserted distinction, however, escapes us. Surely the federal power to tax is no less a delegated power than is the commerce power: both find their genesis

The expressions in these more recent cases trace back to earlier decisions of this Court recognizing the essential role of the States in our federal system of government. Mr. Chief Justice Chase, perhaps because of the particular time at which he occupied that office, had occasion more than once to speak for the Court on this point. In *Texas* v. *White,* 7 Wall. 700, 725 (1869), he declared that "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." In *Lane County* v. *Oregon,* 7 Wall. 71 (1869), his opinion for the Court said:

> "Both the States and the United States existed before the Constitution. The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the Confederate government, which acted with powers, greatly restricted, only upon the States. But in many articles of the Constitution the necessary existence of the States, and, within their proper spheres, the independent authority of the States, is distinctly recognized." *Id.,* at 76.

In *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514 (1926), the Court likewise observed that "neither government may destroy the other nor curtail in any substantial manner the exercise of its powers." *Id.,* at 523.

Appellee Secretary argues that the cases in which this Court has upheld sweeping exercises of authority by Congress, even though those exercises pre-empted state regu-

---

in Art. I, § 8. Nor can characterizing the limitation recognized upon the federal taxing power as an "implied immunity" obscure the fact that this "immunity" is derived from the sovereignty of the States and the concomitant barriers which such sovereignty presents to otherwise plenary federal authority.

lation of the private sector, have already curtailed the sovereignty of the States quite as much as the 1974 amendments to the Fair Labor Standards Act. We do not agree. It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States. We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner. In *Coyle* v. *Oklahoma,* 221 U. S. 559 (1911), the Court gave this example of such an attribute:

> "The power to locate its own seat of government and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers. That one of the original thirteen States could now be shorn of such powers by an act of Congress would not be for a moment entertained." *Id.,* at 565.

One undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime. The question we must resolve here, then, is whether these determinations are " 'functions essential to separate and independent existence,' " *id.,* at 580, quoting from *Lane County* v. *Oregon, supra,* at 76, so that Congress

may not abrogate the States' otherwise plenary authority to make them.

In their complaint appellants advanced estimates of substantial costs which will be imposed upon them by the 1974 amendments. Since the District Court dismissed their complaint, we take its well-pleaded allegations as true, although it appears from appellee's submissions in the District Court and in this Court that resolution of the factual disputes as to the effect of the amendments is not critical to our disposition of the case.

Judged solely in terms of increased costs in dollars, these allegations show a significant impact on the functioning of the governmental bodies involved. The Metropolitan Government of Nashville and Davidson County, Tenn., for example, asserted that the Act will increase its costs of providing essential police and fire protection, without any increase in service or in current salary levels, by $938,000 per year. Cape Girardeau, Mo., estimated that its annual budget for fire protection may have to be increased by anywhere from $250,000 to $400,000 over the current figure of $350,000. The State of Arizona alleged that the annual additional expenditures which will be required if it is to continue to provide essential state services may total $2.5 million. The State of California, which must devote significant portions of its budget to fire-suppression endeavors, estimated that application of the Act to its employment practices will necessitate an increase in its budget of between $8 million and $16 million.

Increased costs are not, of course, the only adverse effects which compliance with the Act will visit upon state and local governments, and in turn upon the citizens who depend upon those governments. In its complaint in intervention, for example, California asserted that it could not comply with the overtime costs (ap-

proximately $750,000 per year) which the Act required to be paid to California Highway Patrol cadets during their academy training program. California reported that it had thus been forced to reduce its academy training program from 2,080 hours to only 960 hours, a compromise undoubtedly of substantial importance to those whose safety and welfare may depend upon the preparedness of the California Highway Patrol.

This type of forced relinquishment of important governmental activities is further reflected in the complaint's allegation that the city of Inglewood, Cal., has been forced to curtail its affirmative action program for providing employment opportunities for men and women interested in a career in law enforcement. The Inglewood police department has abolished a program for police trainees who split their week between on-the-job training and the classroom. The city could not abrogate its contractual obligations to these trainees, and it concluded that compliance with the Act in these circumstances was too financially burdensome to permit continuance of the classroom program. The city of Clovis, Cal., has been put to a similar choice regarding an internship program it was running in cooperation with a California state university. According to the complaint, because the interns' compensation brings them within the purview of the Act the city must decide whether to eliminate the program entirely or to substantially reduce its beneficial aspects by doing away with any pay for the interns.

Quite apart from the substantial costs imposed upon the States and their political subdivisions, the Act displaces state policies regarding the manner in which they will structure delivery of those governmental services which their citizens require. The Act, speaking directly to the States *qua* States, requires that they shall pay

all but an extremely limited minority of their employees the minimum wage rates currently chosen by Congress. It may well be that as a matter of economic policy it would be desirable that States, just as private employers, comply with these minimum wage requirements. But it cannot be gainsaid that the federal requirement directly supplants the considered policy choices of the States' elected officials and administrators as to how they wish to structure pay scales in state employment. The State might wish to employ persons with little or no training, or those who wish to work on a casual basis, or those who for some other reason do not possess minimum employment requirements, and pay them less than the federally prescribed minimum wage. It may wish to offer part-time or summer employment to teenagers at a figure less than the minimum wage, and if unable to do so may decline to offer such employment at all. But the Act would forbid such choices by the States. The only "discretion" left to them under the Act is either to attempt to increase their revenue to meet the additional financial burden imposed upon them by paying congressionally prescribed wages to their existing complement of employees, or to reduce that complement to a number which can be paid the federal minimum wage without increasing revenue.[15]

This dilemma presented by the minimum wage restrictions may seem not immediately different from that faced by private employers, who have long been covered by the Act and who must find ways to increase their gross income if they are to pay higher wages while

---

[15] The complaint recited that a number of appellants were prohibited by their State Constitutions from incurring debts in excess of taxes for the current year. Those Constitutions also impose ceilings upon the percentage rates at which property might be taxed by those governmental units. App. 36–37.

maintaining current earnings. The difference, however, is that a State is not merely a factor in the "shifting economic arrangements" of the private sector of the economy, *Kovacs* v. *Cooper*, 336 U. S. 77, 95 (1949) (Frankfurter, J., concurring), but is itself a coordinate element in the system established by the Framers for governing our Federal Union.

The degree to which the FLSA amendments would interfere with traditional aspects of state sovereignty can be seen even more clearly upon examining the overtime requirements of the Act. The general effect of these provisions is to require the States to pay their employees at premium rates whenever their work exceeds a specified number of hours in a given period. The asserted reason for these provisions is to provide a financial disincentive upon using employees beyond the work period deemed appropriate by Congress. According to appellee:

> "This premium rate can be avoided if the [State] uses other employees to do the overtime work. This, in effect, tends to discourage overtime work and to spread employment, which is the result Congress intended." Brief for Appellee 43.

We do not doubt that this may be a salutary result, and that it has a sufficiently rational relationship to commerce to validate the application of the overtime provisions to private employers. But, like the minimum wage provisions, the vice of the Act as sought to be applied here is that it directly penalizes the States for choosing to hire governmental employees on terms different from those which Congress has sought to impose.

This congressionally imposed displacement of state decisions may substantially restructure traditional ways in which the local governments have arranged their affairs. Although at this point many of the actual effects

under the proposed amendments remain a matter of some dispute among the parties, enough can be satisfactorily anticipated for an outline discussion of their general import. The requirement imposing premium rates upon any employment in excess of what Congress has decided is appropriate for a governmental employee's workweek, for example, appears likely to have the effect of coercing the States to structure work periods in some employment areas, such as police and fire protection, in a manner substantially different from practices which have long been commonly accepted among local governments of this Nation. In addition, appellee represents that the Act will require that the premium compensation for overtime worked must be paid in cash, rather than with compensatory time off, unless such compensatory time is taken in the same pay period. Supplemental Brief for Appellee 9–10; see *Dunlop* v. *New Jersey*, 522 F. 2d 504 (CA3 1975), cert. pending *sub nom. New Jersey* v. *Usery*, No. 75–532. This, too, appears likely to be highly disruptive of accepted employment practices in many governmental areas where the demand for a number of employees to perform important jobs for extended periods on short notice can be both unpredictable and critical. Another example of congressional choices displacing those of the States in the area of what are without doubt essential governmental decisions may be found in the practice of using volunteer firemen, a source of manpower crucial to many of our smaller towns' existence. Under the regulations proposed by appellee, whether individuals are indeed "volunteers" rather than "employees" subject to the minimum wage provisions of the Act are questions to be decided in the courts. See Brief for Appellee 49, and n. 41. It goes without saying that provisions such as these contemplate a significant reduction of traditional

volunteer assistance which has been in the past drawn on to complement the operation of many local governmental functions.

Our examination of the effect of the 1974 amendments, as sought to be extended to the States and their political subdivisions, satisfies us that both the minimum wage and the maximum hour provisions will impermissibly interfere with the integral governmental functions of these bodies. We earlier noted some disagreement between the parties regarding the precise effect the amendments will have in application. We do not believe particularized assessments of actual impact are crucial to resolution of the issue presented, however. For even if we accept appellee's assessments concerning the impact of the amendments, their application will nonetheless significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services.[16] Indeed, it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens. If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest, we think there would be little left of the States' " 'separate and independent existence.' " *Coyle,* 221 U. S., at 580. Thus, even if appellants may have overestimated the effect which the Act will have upon

---

[16] These examples are obviously not an exhaustive catalogue of the numerous line and support activities which are well within the area of traditional operations of state and local governments.

their current levels and patterns of governmental activity, the dispositive factor is that Congress has attempted to exercise its Commerce Clause authority to prescribe minimum wages and maximum hours to be paid by the States in their capacities as sovereign governments. In so doing, Congress has sought to wield its power in a fashion that would impair the States' "ability to function effectively in a federal system," *Fry*, 421 U. S., at 547 n. 7. This exercise of congressional authority does not comport with the federal system of government embodied in the Constitution. We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3.[17]

### III

One final matter requires our attention. Appellee has vigorously urged that we cannot, consistently with the Court's decisions in *Maryland* v. *Wirtz*, 392 U. S. 183 (1968), and *Fry, supra,* rule against him here. It is important to examine this contention so that it will be clear what we hold today, and what we do not.

With regard to *Fry*, we disagree with appellee. There the Court held that the Economic Stabilization Act of 1970 was constitutional as applied to temporarily freeze the wages of state and local government employees. The Court expressly noted that the degree of intrusion upon the protected area of state sovereignty was in that case

---

[17] We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment.

even less than that worked by the amendments to the FLSA which were before the Court in *Wirtz*. The Court recognized that the Economic Stabilization Act was "an emergency measure to counter severe inflation that threatened the national economy." 421 U. S., at 548.

We think our holding today quite consistent with *Fry*. The enactment at issue there was occasioned by an extremely serious problem which endangered the well-being of all the component parts of our federal system and which only collective action by the National Government might forestall. The means selected were carefully drafted so as not to interfere with the States' freedom beyond a very limited, specific period of time. The effect of the across-the-board freeze authorized by that Act, moreover, displaced no state choices as to how governmental operations should be structured, nor did it force the States to remake such choices themselves. Instead, it merely required that the wage scales and employment relationships which the States themselves had chosen be maintained during the period of the emergency. Finally, the Economic Stabilization Act operated to reduce the pressures upon state budgets rather than increase them. These factors distinguish the statute in *Fry* from the provisions at issue here. The limits imposed upon the commerce power when Congress seeks to apply it to the States are not so inflexible as to preclude temporary enactments tailored to combat a national emergency. "[A]lthough an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed." *Wilson* v. *New*, 243 U. S. 332, 348 (1917).

With respect to the Court's decision in *Wirtz*, we reach a different conclusion. Both appellee and the District Court thought that decision required rejection of appel-

lants' claims. Appellants, in turn, advance several arguments by which they seek to distinguish the facts before the Court in *Wirtz* from those presented by the 1974 amendments to the Act. There are undoubtedly factual distinctions between the two situations, but in view of the conclusions expressed earlier in this opinion we do not believe the reasoning in *Wirtz* may any longer be regarded as authoritative.

*Wirtz* relied heavily on the Court's decision in *United States* v. *California,* 297 U. S. 175 (1936). The opinion quotes the following language from that case:

> " '[We] look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual.' 297 U. S., at 185." 392 U. S., at 198.

But we have reaffirmed today that the States as States stand on a quite different footing from an individual or a corporation when challenging the exercise of Congress' power to regulate commerce. We think the dicta [18] from

---

[18] The holding of *United States* v. *California,* as opposed to the language quoted in the text, is quite consistent with our holding today. There California's activity to which the congressional command was directed was not in an area that the States have regarded as integral parts of their governmental activities. It was, on the contrary, the operation of a railroad engaged in "common carriage by rail in interstate commerce . . . ." 297 U. S., at 182.

For the same reasons, despite MR. JUSTICE BRENNAN's claims to the contrary, the holdings in *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964), and *California* v. *Taylor,* 353 U. S. 553 (1957), are likewise unimpaired by our decision today. It also seems appropriate to note that *Case* v. *Bowles,* 327 U. S. 92 (1946), has not been overruled as the dissent asserts. Indeed that decision,

*United States* v. *California,* simply wrong.[19]   Congress may not exercise that power so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made.   We agree that such assertions of power, if unchecked, would indeed, as Mr. Justice Douglas cautioned in his dissent in *Wirtz,* allow "the National Government [to] devour the essentials of state sovereignty," 392 U. S., at 205, and would therefore transgress the bounds of the authority granted Congress under the Commerce Clause.   While there are   obvious differences between the schools and hospitals involved in *Wirtz,* and the fire and police departments affected ·here, each provides an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens.[20]   We are therefore persuaded that *Wirtz* must be overruled.

upon which our Brother heavily relies, has no direct application to the questions we consider today at all.   For there the Court sustained an application of the Emergency Price Control Act to a sale of timber by the State of Washington, expressly noting that the "only question is whether the State's power to make the sales must be in subordination to the power of Congress to fix maximum prices in order to carry on war." *Id.,* at 102.   The Court rejected the State's claim of immunity on the ground that sustaining it would impermissibly "impair a prime purpose of the Federal Government's establishment." *Ibid.*   Nothing we say in this opinion addresses the scope of Congress' authority under its war power. Cf. n. 17, *supra.*

[19] MR. JUSTICE BRENNAN's dissent leaves no doubt from its discussion, *post,* at 876–878, that in its view Congress may under its commerce power deal with the States as States just as they might deal with private individuals.   We venture to say that it is this conclusion, rather than the one we reach, which is in the words of the dissent a "startling restructuring of our federal system . . . ," *post,* at 875.   Even the appellee Secretary, defending the 1974 amendments in this Court, does not take so extreme a position.

[20] As the denomination "political subdivision" implies, the local

The judgment of the District Court is accordingly reversed, and the cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE BLACKMUN, concurring.

The Court's opinion and the dissents indicate the importance and significance of this litigation as it bears upon the relationship between the Federal Government and our States. Although I am not untroubled by certain possible implications of the Court's opinion—some of them suggested by the dissents—I do not read the opinion so despairingly as does my Brother BRENNAN. In my view, the result with respect to the statute under challenge here is necessarily correct. I may misinterpret the Court's opinion, but it seems to me that it adopts a balancing approach, and does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential. See *ante,* at 852–853. With this understanding on my part of the Court's opinion, I join it.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

The Court concedes, as of course it must, that Congress enacted the 1974 amendments pursuant to its exclusive power under Art. I, § 8, cl. 3, of the Constitution

governmental units which Congress sought to bring within the Act derive their authority and power from their respective States. Interference with integral governmental services provided by such subordinate arms of a state government is therefore beyond the reach of congressional power under the Commerce Clause just as if such services were provided by the State itself.

"[t]o regulate Commerce . . . among the several States."
It must therefore be surprising that my Brethren should
choose this bicentennial year of our independence to
repudiate principles governing judicial interpretation of
our Constitution settled since the time of Mr. Chief Jus-
tice John Marshall, discarding his postulate that the Con-
stitution contemplates that restraints upon exercise by
Congress of its plenary commerce power lie in the politi-
cal process and not in the judicial process.   For 152 years
ago Mr. Chief Justice Marshall enunciated that principle
to which, until today, his successors on this Court have
been faithful.

> "[T]he power over commerce . . . is vested in Con-
> gress as absolutely as it would be in a single govern-
> ment, having in its constitution the same restrictions
> on the exercise of the power as are found in the
> constitution of the United States.   *The wisdom and
> the discretion of Congress, their identity with the
> people, and the influence which their constituents
> possess at elections, are . . . the sole restraints on
> which they have relied, to secure them from its
> abuse.   They are the restraints on which the people
> must often rely solely, in all representative govern-
> ments.*"   *Gibbons* v. *Ogden,* 9 Wheat. 1, 197 (1824)
> (emphasis added).[1]

Only 34 years ago, *Wickard* v. *Filburn,* 317 U. S. 111,
120 (1942), reaffirmed that "[a]t the beginning Chief
Justice Marshall . . . made emphatic the embracing and
penetrating nature of [Congress' commerce] power by

---

[1] "A government ought to contain in itself every power requisite
to the full accomplishment of the objects committed to its care,
and to the complete execution of the trusts for which it is responsi-
ble; free from every other control, but a regard to the public good
and to the sense of the people." The Federalist No. 31, p. 195
(J. Cooke ed. 1961) (A. Hamilton).

warning that effective restraints on its exercise must proceed from political rather than from judicial processes."

My Brethren do not successfully obscure today's patent usurpation of the role reserved for the political process by their purported discovery in the Constitution of a restraint derived from sovereignty of the States on Congress' exercise of the commerce power. Mr. Chief Justice Marshall recognized that limitations "prescribed in the constitution," *Gibbons* v. *Ogden, supra,* at 196, restrain Congress' exercise of the power. See *Parden* v. *Terminal R. Co.,* 377 U. S. 184, 191 (1964); *Katzenbach* v. *McClung,* 379 U. S. 294, 305 (1964); *United States* v. *Darby,* 312 U. S. 100, 114 (1941). Thus laws within the commerce power may not infringe individual liberties protected by the First Amendment, *Mabee* v. *White Plains Publishing Co.,* 327 U. S. 178 (1946); the Fifth Amendment, *Leary* v. *United States,* 395 U. S. 6 (1969); or the Sixth Amendment, *United States* v. *Jackson,* 390 U. S. 570 (1968). But there is no restraint based on state sovereignty requiring or permitting judicial enforcement anywhere expressed in the Constitution; our decisions over the last century and a half have explicitly rejected the existence of any such restraint on the commerce power.[2]

---

[2] Some decisions reflect the Court's reluctance to interpret legislation to alter the federal-state balance of power. See, *e. g., Employees* v. *Missouri Public Health Dept.,* 411 U. S. 279, 285–287 (1973); *United States* v. *Bass,* 404 U. S. 336, 349 (1971). Rather than state any limit on congressional power, however, these decisions merely rely on our traditional canon of construction in the face of statutory ambiguity that recognizes a presumption that Congress normally considers effects on federalism before taking action displacing state authority. Stern, The Commerce Clause and the National Economy, 1933–1946, Part Two, 59 Harv. L. Rev. 883, 946 (1946). There is no claim that the 1974 amendments are not clearly intended to apply to the States, nor is there any suggestion that Congress was unaware of the federalism issue.

We said in *United States* v. *California,* 297 U. S. 175, 184 (1936), for example: "The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. . . . [T]he power of the state is subordinate to the constitutional exercise of the granted federal power." This but echoed another principle emphasized by Mr. Chief Justice Marshall:

> "If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. . . .
>
> "The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'any thing in the constitution or laws of any State to the contrary notwithstanding.' " *M'Culloch* v. *Maryland,* 4 Wheat. 316, 405–406 (1819).

"[It] is not a controversy between equals" when the Federal Government "is asserting its sovereign power to regulate commerce . . . . [T]he interests of the nation are more important than those of any State." *Sanitary District* v. *United States,* 266 U. S. 405, 425–426 (1925). The commerce power "is an affirmative power commensurate with the national needs." *North American Co.* v. *SEC,* 327 U. S. 686, 705 (1946). The Constitution reserves to the States "only . . . that authority which is consistent with and not opposed to the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized

exercise of Federal power." *The Minnesota Rate Cases,* 230 U. S. 352, 399 (1913). "The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject matter specifically committed to its charge." *In re Rahrer,* 140 U. S. 545, 562 (1891).

My Brethren thus have today manufactured an abstraction without substance, founded neither in the words of the Constitution nor on precedent. An abstraction having such profoundly pernicious consequences is not made less so by characterizing the 1974 amendments as legislation directed against the "States *qua* States." *Ante,* at 847. See *ante,* at 845, 854. Of course, regulations that this Court can say are not regulations of "commerce" cannot stand, *Santa Cruz Fruit Packing Co.* v. *NLRB,* 303 U. S. 453, 466 (1938), and in this sense "[t]he Court has ample power to prevent . . . 'the utter destruction of the State as a sovereign political entity.' " *Maryland* v. *Wirtz,* 392 U. S. 183, 196 (1968).[3] But my

___

[3] As support for the creation of a state sovereignty limitation on the commerce power, my Brethren quote this statement in *Wirtz* out of context. *Ante,* at 842. This statement is at the end of a paragraph in *Wirtz* recognizing that Congress' commerce power is limited because it reaches only " 'commerce with foreign nations and among the several States.' " 392 U. S., at 196, quoting *Santa Cruz Fruit Packing Co.* v. *NLRB,* 303 U. S., at 466. The passage that follows the language quoted by the Court is:

"But while the commerce power has limits, valid general regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation." 392 U. S., at 196–197. It is clear, then, that this Court's "ample power" to prevent the destruction of the States was not found in *Wirtz* to result from some affirmative limit on the exercise of the commerce power, but rather in the Court's function of limiting congressional exercise of its power to regulation of "commerce."

Brethren make no claim that the 1974 amendments are not regulations of "commerce"; rather they overrule *Wirtz* in disagreement with historic principles that *United States* v. *California, supra,* reaffirmed: "[W]hile the commerce power has limits, valid general regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation." *Wirtz, supra,* at 196–197. Clearly, therefore, my Brethren are also repudiating the long line of our precedents holding that a judicial finding that Congress has not unreasonably regulated a subject matter of "commerce" brings to an end the judicial role. "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *M'Culloch* v. *Maryland, supra,* at 421.

The reliance of my Brethren upon the Tenth Amendment as "an express declaration of [a state sovereignty] limitation," *ante,* at 842,[4] not only suggests that they

---

[4] The Court relies on *Fry* v. *United States,* 421 U. S. 542, 547 n. 7 (1975), but I cannot subscribe to reading *Fry* as departing, without analysis, from a principle that has remained unquestioned for over 150 years. Although the Tenth Amendment "is not without significance," *ibid.,* its meaning is clear: it declares that our Federal Government is one of delegated powers. And it is because of this constraint, rather than the state-sovereignty doctrine discovered today by the Court, "that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Ibid.* *Fry* did not say that there is a limit in the Tenth Amendment on the exercise of a delegated power, but instead said that "Congress may not exercise power in a fashion that . . . ." The only import of the footnote in *Fry,* then,

overrule governing decisions of this Court that address this question but must astound scholars of the Constitution. For not only early decisions, *Gibbons* v. *Ogden,* 9 Wheat., at 196; *M'Culloch* v. *Maryland, supra,* at 404–407; and *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 324–325 (1816), hold that nothing in the Tenth Amendment constitutes a limitation on congressional exercise of powers delegated by the Constitution to Congress. See F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 39–40 (1937). Rather, as the Tenth Amendment's significance was more recently summarized:

> "The amendment states but a truism that all is retained which has not been surrendered. *There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment* or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers. . . .
>
> "From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the per-

---

is that Congress may not invade state sovereignty by exercising powers not delegated to it by the Constitution; since the wage ceilings at issue in *Fry* were clearly within the commerce power, we found no "drastic invasion of state sovereignty." *Id.,* at 548 n. 7. Even the author of today's opinion stated in *Fry* that the Tenth Amendment does not "by its terms" restrict Congress' power to regulate commerce. *Id.,* at 557 (REHNQUIST, J., dissenting).

mitted end." *United States* v. *Darby,* 312 U. S., at 124 (emphasis added).[5]

My Brethren purport to find support for their novel state-sovereignty doctrine in the concurring opinion of Mr. Chief Justice Stone in *New York* v. *United States,* 326 U. S. 572, 586 (1946). That reliance is plainly misplaced. That case presented the question whether the Constitution either required immunity of New York State's mineral water business from federal taxation or denied to the Federal Government power to lay the tax. The Court sustained the federal tax. Mr. Chief Justice Stone observed in his concurring opinion that "a federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government." *Id.,* at 587. But the Chief Justice was addressing not the question of a state-sovereignty restraint upon the exercise of the commerce power, but rather the principle of implied immunity of the States

---

[5] In support of the first-quoted paragraph, *Darby* cited 2 J. Elliot, Debates 123, 131 (2d ed. 1787); 3 *id.,* at 450, 464, 600; 4 *id.,* at 140, 148; 1 Annals of Congress 432, 761, 767–768 (1789); 2 J. Story, Commentaries on the Constitution §§ 1907–1908 (2d ed. 1851) ("It is plain, therefore, that it could not have been the intention of the framers of this amendment to give it effect, as an abridgment of any of the powers granted under the constitution, whether they are express or implied, direct or incidental. Its sole design is to exclude any interpretation, by which other powers should be assumed beyond those which are granted").

Decisions expressly rejecting today's interpretation of the Tenth Amendment also include *Sperry* v. *Florida ex rel. Florida Bar,* 373 U. S. 379, 403 (1963); *Oklahoma* v. *CSC,* 330 U. S. 127, 143 (1947); *Case* v. *Bowles,* 327 U. S. 92, 102 (1946); *Fernandez* v. *Wiener,* 326 U. S. 340, 362 (1945); *Oklahoma ex rel. Phillips* v. *Atkinson Co.,* 313 U. S. 508, 534 (1941); *United States* v. *Sprague,* 282 U. S. 716, 733–734 (1931).

and Federal Government from taxation by the other: "The counterpart of such undue interference has been recognized since Marshall's day as the implied immunity of each of the dual sovereignties of our constitutional system from taxation by the other." *Ibid.*

In contrast, the apposite decision that Term to the question whether the Constitution implies a state-sovereignty restraint upon congressional exercise of the commerce. power is *Case* v. *Bowles,* 327 U. S. 92 (1946). The question there was whether the Emergency Price Control Act could apply to the sale by the State of Washington of timber growing on lands granted by Congress to the State for the support of common schools. The State contended that "there is a doctrine implied in the Federal Constitution that 'the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other' . . . [and] that the Act cannot be applied to this sale because it was 'for the purpose of gaining revenue to carry out an essential governmental function—the education of its citizens.'" *Id.,* at 101. The Court emphatically rejected that argument, in an opinion joined by Mr. Chief Justice Stone, reasoning:

> "Since the Emergency Price Control Act has been sustained as a congressional exercise of the war power, the [State's] argument is that the extent of that power as applied to state functions depends on whether these are 'essential' to the state government. The use of the same criterion in measuring the constitutional power of Congress to tax has proved to be unworkable, and we reject it as a guide in the field here involved. Cf. *United States* v. *California,* . . . 297 U. S. at 183–185." *Ibid.*[6]

---

[6] *Case* also expressed concerns about creating a state-sovereignty limitation on a delegated power that are equally applicable to re-

The footnote to this statement rejected the suggested dichotomy between essential and nonessential state governmental functions as having "proved to be unworkable" by referring to "the several opinions in *New York* v. *United States,* 326 U. S. 572." *Id.,* at 101 n. 7. Even more significant for our purposes is the Court's citation of *United States* v. *California,* a case concerned with Congress' power to regulate commerce, as supporting the rejection of the State's contention that state sovereignty is a limitation on Congress' war power. *California* directly presented the question whether any state-sovereignty restraint precluded application of the Federal Safety Appliance Act to a state owned and operated railroad. The State argued "that as the state is operating the railroad without profit, for the purpose of facilitating the commerce of the port, and is using the net proceeds of operation for harbor improvement, . . . it is engaged in performing a public function in its sovereign capacity and for that reason cannot constitutionally be subjected to the provisions of the federal Act." 297 U. S., at 183. Mr. Justice Stone rejected the contention in an opinion

---

strictions on the commerce power: "The result would be that the constitutional grant of the power to make war would be inadequate to accomplish its full purpose. And this result would impair a prime purpose of the Federal Government's establishment." 327 U. S., at 102. My Brethren intimate that Congress' war power is more properly viewed as "a prime purpose of the Federal Government's establishment" than the commerce power. *Ante,* at 855 n. 18. Nothing could be further from the fact. "The sole purpose for which Virginia initiated the movement which ultimately produced the Constitution was 'to take into consideration the trade of the United States; to examine the relative situations and trade of the said States; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony' . . . . No other federal power was so universally assumed to be necessary, no other state power was so readily relinquished." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 533–534 (1949); see *id.,* at 532–535.

for a unanimous Court. His rationale is a complete refutation of today's holding:

"That in operating its railroad [the State] is acting within a power reserved to the states cannot be doubted. . . . The only question we need consider is whether the exercise of that power, in whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. . . .

"The analogy of the constitutional immunity of state instrumentalities from federal taxation, on which [California] relies, is not illuminating. That immunity is implied from the nature of our federal system and the relationship within it of state and national governments, and is equally a restriction on taxation by either of the instrumentalities of the other. Its nature requires that it be so construed as to allow to each government reasonable scope for its taxing power . . . which would be unduly curtailed if either by extending its activities could withdraw from the taxing power of the other subjects of taxation traditionally within it. . . . Hence we look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. *But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual.*" *Id.,* at 183–185 (emphasis added).[7]

---

[7] Even in the tax area the States' immunity has not gone unchallenged. The separate opinion of Mr. Justice Frankfurter in *New*

Today's repudiation of this unbroken line of precedents that firmly reject my Brethren's ill-conceived abstraction can only be regarded as a transparent cover for invalidating a congressional judgment with which they disagree.[8]  The only analysis even remotely resembling that

*York* v. *United States,* 326 U. S. 572, 573 (1946), argued that the only limitation on the federal power to tax was that Congress not discriminate against the States.  There is no such discrimination in the 1974 amendments, since they apply to both public and private employers.  Mr. Justice Frankfurter noted a distinction between immunities claimed to invalidate state taxes on federal activities and those urged as a basis for rejecting federal taxes.  "The federal government is the government of all the States, and all the States share in the legislative process by which a tax of general applicability is laid." *Id.,* at 577.  See *M'Culloch* v. *Maryland,* 4 Wheat. 316, 405–406 (1819).  He also recognized that immunity in this area had been significantly eroded since it was first used to protect state officials from a federal tax in *Collector* v. *Day,* 11 Wall. 113 (1871).  See, *e. g., Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939), overruling *Collector* v. *Day, supra; Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376 (1938) ; *Fox Film Corp.* v. *Doyal,* 286 U. S. 123 (1932).

Even more significantly, Mr. Justice Frankfurter pointed out that the existence of a state immunity from federal taxation, to the extent that it was based on any vague sovereignty notions, was inconsistent with the holding in *United States* v. *California,* 297 U. S. 175 (1936), that state sovereignty does not restrict federal exercise of the commerce power.  326 U. S., at 582.

[8] My Brethren's reliance on *Texas* v. *White,* 7 Wall. 700, 725 (1869), and *Lane County* v. *Oregon,* 7 Wall. 71, 76 (1869), is puzzling to say the least.  The Brethren make passing reference to the unique historical setting in which those cases were decided, *ante,* at 844, but pointedly ignore the significance of the events of those days.  During the tenure of Mr. Chief Justice Chase, the War Between the States, fought to preserve the supremacy of the Union, was won; Congress and the States then enacted three constitutional Amendments, the Thirteenth, Fourteenth, and Fifteenth, enlarging federal power and concomitantly contracting the States' power, see *Ex parte Virginia,* 100 U. S. 339, 345 (1880) ; and Congress enacted a variety of laws during Reconstruction further restricting state

adopted today is found in a line of opinions dealing with the Commerce Clause and the Tenth Amendment that ultimately provoked a constitutional crisis for the Court in the 1930's. *E. g., Carter* v. *Carter Coal Co.,* 298 U. S. 238 (1936); *United States* v. *Butler,* 297 U. S. 1 (1936); *Hammer* v. *Dagenhart,* 247 U. S. 251 (1918). See Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv. L. Rev. 645 (1946). We tend to forget that the Court invalidated legislation during the Great Depression, not solely under the Due Process Clause, but also and primarily under the Commerce Clause and the Tenth Amendment. It may have been the eventual abandonment of that overly restrictive construction of the commerce power that spelled defeat for the Court-packing plan, and preserved the integrity of this institution, *id.,* at 682, see, *e. g., United States* v. *Darby,* 312 U. S. 100 (1941); *Mulford* v. *Smith,* 307 U. S. 38 (1939); *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937), but my Brethren today are transparently trying to cut back on that recognition of the scope of the commerce power. My Brethren's approach to this case is not far different from the dissenting opinions in the cases that averted the crisis. See, *e. g., Mulford* v. *Smith, supra,* at 51 (Butler, J., dissenting); *NLRB* v. *Jones & Laughlin Steel Corp., supra,* at 76 (McReynolds, J., dissenting).[9]

---

sovereignty. *Texas* v. *White* itself noted that the Constitution empowered Congress to form a new government in a State if the citizens of that State were being denied a republican form of government. 7 Wall., at 729. And the Court recognized in *Lane County* that "[t]he people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme." 7 Wall., at 76.

[9] Even those dissenting opinions, however, were more faithful to the Constitution than is today's decision. They relied on the Tenth

That no precedent justifies today's result is particularly clear from the awkward extension of the doctrine of state immunity from federal taxation—an immunity conclusively distinguished by Mr. Justice Stone in *California*, and an immunity that is "narrowly limited" because "the people of all the states have created the national government and are represented in Congress," *Helvering* v. *Gerhardt*, 304 U. S. 405, 416 (1938) (Stone, J.)[10]—to fashion a judicially enforceable restraint on

---

Amendment to invalidate federal legislation only because they found the enactments not within the scope of the commerce power, and thus not within a power delegated to Congress. More importantly, they made no distinction between private parties and States; in their view, what was not commerce for one was commerce for no one. My Brethren today, however, arrive at their novel constitutional theory in defiance of the plain language of the Tenth Amendment, differentiating "the people" from "the States." They apparently hold that a power delegated to Congress with respect to the former is, contrary to the clear wording of the Amendment, not delegated as to the latter, because this conclusion is more consonant with their view of a proper distribution of governmental power. But, "however socially desirable the goals sought to be advanced ..., advancing them through a freewheeling nonelected judiciary is quite unacceptable in a democratic society." Rehnquist, The Notion of a Living Constitution, 54 Tex. L. Rev. 693, 699 (1976). Compare *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 605 (1976) (BLACKMUN, J., concurring in judgment), with *id.*, at 614 (STEWART, J., dissenting).

[10] The danger to the federal power to tax of hypothesizing any constraint, derived from state sovereignty and monitored by this Court, was expressly recognized:

"Another reason [for narrowly limiting state sovereignty restrictions on the power to tax] rests upon the fact that any allowance of a tax immunity for the protection of state sovereignty is at the expense of the sovereign power of the nation to tax. Enlargement of the one involves diminution of the other. When enlargement proceeds beyond the necessity of protecting the state, the burden of the immunity is thrown upon the national government with benefit only to a privileged class of taxpayers. See *Metcalf & Eddy* v. *Mitchell*,

Congress' exercise of the commerce power that the Court has time and again rejected as having no place in our constitutional jurisprudence.[11] "[W]here [Congress]

269 U. S. 514 [1926]; cf. *Thomson* v. *Pacific Railroad,* 9 Wall. 579, 588, 590 [1870]. With the steady expansion of the activity of state governments into new fields they have undertaken the performance of functions not known to the states when the Constitution was adopted, and have taken over the management of business enterprises once conducted exclusively by private individuals subject to the national taxing power. In a complex economic society tax burdens laid upon those who directly or indirectly have dealings with the states, tend, to some extent not capable of precise measurement, to be passed on economically and thus to burden the state government itself. But if every federal tax which is laid on some new form of state activity, or whose economic burden reaches in some measure the state or those who serve it, were to be set aside as an infringement of state sovereignty, it is evident that a restriction upon national power, devised only as a shield to protect the states from curtailment of the essential operations of government which they have exercised from the beginning, would become a ready means for striking down the taxing power of the nation. See *South Carolina* v. *United States,* 199 U. S. 437, 454–455 [1905]. Once impaired by the recognition of a state immunity found to be excessive, restoration of that power is not likely to be secured through the action of state legislatures; for they are without the inducements to act which have often persuaded Congress to waive immunities thought to be excessive." *Helvering* v. *Gerhardt,* 304 U. S., at 416–417 (footnote omitted).

[11] My Brethren also ignore our holdings that the principle of state sovereignty held to be embodied in the Eleventh Amendment can be overridden by Congress under the Commerce Clause. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976); *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964). Although the Eleventh Amendment can be overcome by exercise of the power to regulate commerce, my Brethren never explain why the protections of state sovereignty they erroneously find embodied in the Tenth Amendment cannot similarly be overcome. Instead, they merely tell us which delegated powers are limited by state sovereignty, *ante,* at 843–844, n. 14, and which are not, *ante,* at 854–855, n. 18, see also *Kleppe* v. *New Mexico, ante,* p. 529, but neither reason nor precedent distinguishing among these powers is provided.

keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Republic, not to interfere." *Katzenbach* v. *McClung,* 379 U. S., at 305.

To argue, as do my Brethren, that the 1974 amendments are directed at the "States *qua* States," and "displac[e] state policies regarding the manner in which they will structure delivery of those governmental services which their citizens require," *ante,* at 847, and therefore "directly penaliz[e] the States for choosing to hire governmental employees on terms different from those which Congress has sought to impose," *ante,* at 849, is only to advance precisely the unsuccessful arguments made by the State of Washington in *Case* v. *Bowles* and the State of California in *United States* v. *California.* The 1974 amendments are, however, an entirely legitimate exercise of the commerce power, not in the slightest restrained by any doctrine of state sovereignty cognizable in this Court, as *Case* v. *Bowles, United States* v. *California, Maryland* v. *Wirtz,* and our other pertinent precedents squarely and definitively establish. Moreover, since *Maryland* v. *Wirtz* is overruled, the Fair Labor Standards Act is invalidated in its application to all state employees "in [any areas] that the States have regarded as integral parts of their governmental activities." *Ante,* at 854 n. 18. This standard is a meaningless limitation on the Court's state-sovereignty doctrine, and thus today's holding goes beyond even what the States of Washington and California urged in *Case* v. *Bowles* and *United States* v. *California,* and by its logic would overrule those cases and with them *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964), and certain reasoning in *Employees* v. *Missouri Public Health Dept.,* 411 U. S. 279, 284–285 (1973). I cannot recall another instance in the Court's history when the reasoning of so many decisions covering so long a span of time has been

discarded in such a roughshod manner. That this is done without any justification not already often advanced and consistently rejected, clearly renders today's decision an *ipse dixit* reflecting nothing but displeasure with a congressional judgment.

My Brethren's treatment of *Fry* v. *United States,* 421 U. S. 542 (1975), further illustrates the paucity of legal reasoning or principle justifying today's result. Although the Economic Stabilization Act "displace[d] the States' freedom," *ante,* at 852—the reason given for invalidating the 1974 amendments—the result in *Fry* is not disturbed since the interference was temporary and only a national program enforced by the Federal Government could have alleviated the country's economic crisis. Thus, although my Brethren by fiat strike down the 1974 amendments without analysis of countervailing national considerations, *Fry* by contrary logic remains undisturbed because, on balance, countervailing national considerations override the interference with the State's freedom. Moreover, it is sophistry to say the Economic Stabilization Act "displaced no state choices," *ante,* at 853, but that the 1974 amendments do, *ante,* at 848. Obviously the Stabilization Act—no less than every exercise of a national power delegated to Congress by the Constitution—displaced the State's freedom. It is absurd to suggest that there is a constitutionally significant distinction between curbs against increasing wages and curbs against paying wages lower than the federal minimum.

Today's holding patently is in derogation of the sovereign power of the Nation to regulate interstate commerce. Can the States engage in businesses competing with the private sector and then come to the courts arguing that withdrawing the employees of those businesses from the private sector evades the power of the Federal Government to regulate commerce? See *New York* v.

*United States,* 326 U. S., at 582 (opinion of Frankfurter, J.). No principle given meaningful content by my Brethren today precludes the States from doing just that. Our historic decisions rejecting all suggestions that the States stand in a different position from affected private parties when challenging congressional exercise of the commerce power reflect that very concern. *Maryland* v. *Wirtz,* 392 U. S. 183 (1968); *United States* v. *California,* 297 U. S. 175 (1936). *Fry* only last Term emphasized "that States are not immune from all federal regulation under the Commerce Clause *merely because of their sovereign status.*" 421 U. S., at 548 (emphasis added). For "[b]y empowering Congress to regulate commerce . . . the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." *Parden* v. *Terminal R. Co., supra,* at 192; see *Employees* v. *Missouri Public Health Dept., supra,* at 286. Employment relations of States that subject themselves to congressional regulation by participating in regulable commerce are subject to congressional regulation. *California* v. *Taylor,* 353 U. S. 553, 568 (1957). Plainly it has gotten no earlier since we declared it "too late in the day to question the power of Congress under the Commerce Clause to regulate . . . activities and instrumentalities [in interstate commerce] . . . whether they be the activities and instrumentalities of private persons or of public agencies." *California* v. *United States,* 320 U. S. 577, 586 (1944).

Also devoid of meaningful content is my Brethren's argument that the 1974 amendments "displac[e] State policies." *Ante,* at 847. The amendments neither impose policy objectives on the States nor deny the States complete freedom to fix their own objectives. My Brethren boldly assert that the decision as to wages and hours is an "undoubted attribute of state sovereignty,"

*ante,* at 845, and then never say why. Indeed, they disclaim any reliance on the costs of compliance with the amendments in reaching today's result. *Ante,* at 846, 851. This would enable my Brethren to conclude that, however insignificant that cost, any federal regulation under the commerce power "will nonetheless significantly alter or displace the States' abilities to structure employer-employee relationships." *Ante,* at 851.[12]

---

[12] My Brethren's reluctance to rely on the cost of compliance to invalidate this legislation is advisable.

"Such matters raise not constitutional issues but questions of policy. They relate to the wisdom, need, and effectiveness of a particular project. They are therefore questions for the Congress, not the courts." *Oklahoma ex rel. Phillips* v. *Atkinson Co.,* 313 U. S., at 527. See *Employees* v. *Missouri Public Health Dept.,* 411 U. S. 279 284 (1973). Although my Brethren accept for present purposes the well-pleaded allegations of appellants' complaint, I note that the Secretary vigorously argues in this Court that appellants' cost allegations are greatly exaggerated and based on misinterpretations of the 1974 amendments. For example, the executive vice president of the National League of Cities stated in a deposition that the federal minimum wage would have little impact on city budgets since "most cities were already in compliance." App. 124. My Brethren's concern about the use of volunteers is also unfounded. No provision proscribes the use of volunteers or regulates their compensation in any way. Indeed, the Department of Labor's regulations read the FLSA as providing that payments to individuals below a certain level are presumptive evidence of volunteer status; above that level volunteer status depends on particular circumstances. 29 CFR § 553.11 (1975). That the question whether an individual is an employee or a volunteer might be resolved in the courts has nothing to do with federalism, since Congress has rationally decided to regulate the wages of state employees under the Commerce Clause. The Secretary also maintains that misconceptions permeate the other claims of final impact, such as the failure to account for overtime exemptions for police and fire personnel, 29 U. S. C. § 207 (k) (1970 ed., Supp. IV), but further analysis of appellants' allegations would not be profitable, nor might it even be possible in view of their failure to specify adequately the method of calculating the costs.

This then would mean that, whether or not state wages are paid for the performance of an "essential" state function (whatever that may mean), the newly discovered state-sovereignty constraint could operate as a flat and absolute prohibition against congressional regulation of the wages and hours of state employees under the Commerce Clause. The portent of such a sweeping holding is so ominous for our constitutional jurisprudence as to leave one incredulous.

Certainly the paradigm of sovereign action—action *qua* State—is in the enactment and enforcement of state laws. Is it possible that my Brethren are signaling abandonment of the heretofore unchallenged principle that Congress "can, if it chooses, entirely displace the States to the full extent of the far-reaching Commerce Clause"? *Bethlehem Steel Co.* v. *New York State Board,* 330 U. S. 767, 780 (1947) (opinion of Frankfurter, J.). Indeed, that principle sometimes invalidates state laws regulating subject matter of national importance even when Congress has been silent. *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824); see *Sanitary District* v. *United States,* 266 U. S., at 426. In either case the ouster of state laws obviously curtails or prohibits the States' prerogatives to make policy choices respecting subjects clearly of greater significance to the "State *qua* State" than the minimum wage paid to state employees. The Supremacy Clause dictates this result under "the federal system of government embodied in the Constitution." *Ante,* at 852.

My Brethren do more than turn aside longstanding constitutional jurisprudence that emphatically rejects today's conclusion. More alarming is the startling restructuring of our federal system, and the role they create therein for the federal judiciary. This Court is simply not at liberty to erect a mirror of its own conception of a desirable governmental structure. If the 1974 amend-

ments have any "vice," *ante,* at 849, my Brother STEVENS is surely right that it represents "merely . . . a policy issue which has been firmly resolved by the branches of government having power to decide such questions." *Post,* at 881. It bears repeating "that effective restraints on . . . exercise [of the commerce power] must proceed from political rather than from judicial processes." *Wickard* v. *Filburn,* 317 U. S., at 120.

It is unacceptable that the judicial process should be thought superior to the political process in this area. Under the Constitution the Judiciary has no role to play beyond finding that Congress has not made an unreasonable legislative judgment respecting what is "commerce." My Brother BLACKMUN suggests that controlling judicial supervision of the relationship between the States and our National Government by use of a balancing approach diminishes the ominous implications of today's decision. Such an approach, however, is a thinly veiled rationalization for judicial supervision of a policy judgment that our system of government reserves to Congress.

Judicial restraint in this area merely recognizes that the political branches of our Government are structured to protect the interests of the States, as well as the Nation as a whole, and that the States are fully able to protect their own interests in the premises. Congress is constituted of representatives in both the Senate and House *elected from the States.* The Federalist No. 45, pp. 311–312, No. 46, pp. 317–318 (J. Cooke ed. 1961) (J. Madison). Decisions upon the extent of federal intervention under the Commerce Clause into the affairs of the States are in that sense decisions of the States themselves. Judicial redistribution of powers granted the National Government by the terms of the Constitution violates the fundamental tenet of our fed-

eralism that the extent of federal intervention into the States' affairs in the exercise of delegated powers shall be determined by the States' exercise of political power through their representatives in Congress. See Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Col. L. Rev. 543 (1954). There is no reason whatever to suppose that in enacting the 1974 amendments Congress, even if it might extensively obliterate state sovereignty by fully exercising its plenary power respecting commerce, had any purpose to do so. Surely the presumption must be to the contrary. Any realistic assessment of our federal political system, dominated as it is by representatives of the people *elected from the States,* yields the conclusion that it is highly unlikely that those representatives will ever be motivated to disregard totally the concerns of these States.[13] The Federalist No. 46, *supra,* at 319. Certainly this was the premise upon which the Constitution, as authoritatively explicated in *Gibbons* v. *Ogden,* was founded. Indeed, though the States are represented in

---

[13] The history of the 1974 amendments is a striking example of the political process in operation. When Congress in 1973 passed FLSA amendments that extended coverage to state and local employees, the President vetoed the bill and stated among his objections that "[e]xtension of Federal minimum wage and overtime standards to State and local government employees is an unwarranted interference with State prerogatives." 119 Cong. Rec. 28743 (1973). The veto was sustained. *Id.,* at 30266, 30292. But when Congress moderated its position and passed the bill in another form, the President signed it and noted the compromise: "S. 2747 also extends coverage to include Federal, State, and local government employees, domestic workers, and others previously excluded from coverage. The Congress has reduced some of the economic and social disruptions this extension could cause by recognizing the unique requirements of police, fire, and correctional services." 10 Weekly Comp. of Presidential Documents 392 (1974).

the National Government, national interests are not similarly represented in the States' political processes. Perhaps my Brethren's concern with the Judiciary's role in preserving federalism might better focus on whether Congress, not the States, is in greater need of this Court's protection. See *New York* v. *United States,* 326 U. S., at 582 (opinion of Frankfurter, J.); *Helvering* v. *Gerhardt,* 304 U. S., at 416.

A sense of the enormous impact of States' political power is gained by brief reference to the federal budget. The largest estimate by any of the appellants of the cost impact of the 1974 amendments—$1 billion—pales in comparison with the financial assistance the States receive from the Federal Government. In fiscal 1977 the President's proposed budget recommends $60.5 billion in federal assistance to the States, exclusive of loans. Office of Management and Budget, Special Analyses: Budget of the United States Government, Fiscal Year 1977, p. 255. Appellants complain of the impact of the amended FLSA on police and fire departments, but the 1977 budget contemplates outlays for law enforcement assistance of $716 million. *Id.,* at 258. Concern is also expressed about the diminished ability to hire students in the summer if States must pay them a minimum wage, but the Federal Government's "summer youth program" provides $400 million for 670,000 jobs. *Ibid.* Given this demonstrated ability to obtain funds from the Federal Government for needed state services, there is little doubt that the States' influence in the political process is adequate to safeguard their sovereignty.[14]

---

[14] In contrast, my Brethren frequently remand powerless individuals to the political process by invoking doctrines of standing, justiciability, and remedies. For example, in *Warth* v. *Seldin,* 422 U. S. 490 (1975), the Court suggested that some residents of Rochester,

My Brethren's disregard for precedents recognizing these long-settled constitutional principles is painfully obvious in their cavalier treatment of *Maryland* v. *Wirtz*. Without even a passing reference to the doctrine of *stare decisis*, *Wirtz*—regarded as controlling only last Term, *Fry* v. *United States*, 421 U. S., at 548, and as good law in *Employees* v. *Missouri Public Health Dept.*, 411 U. S., at 283—is by exercise of raw judicial power overruled.

No effort is made to distinguish the FLSA amendments sustained in *Wirtz* from the 1974 amendments. We are told at the outset that "the 'far-reaching implications' of *Wirtz* should be overruled," *ante*, at 840; later it is said that the "reasoning in *Wirtz*" is no longer "authoritative," *ante*, at 854. My Brethren then merely restate their essential-function test and say that *Wirtz* must "therefore" be overruled. *Ante*, at 855–856. There is no analysis whether *Wirtz* reached the correct result, apart from any flaws in reasoning, even though we are told that "there are obvious differences" between this case and *Wirtz*. *Ante*, at 855.[15] Are state and fed-

---

N. Y., "not overlook the availability of the normal democratic process," *id.*, at 508 n. 18, even though they were challenging a suburban zoning ordinance and had no voice in the suburb's political affairs. In this case, however, those entities with perhaps the greatest representation in the political process have lost a legislative battle, but when they enter the courts and repeat the arguments made in the political branches, the Court welcomes them with open arms, embraces their political cause, and overrides Congress' political decision.

[15] In contrast, the Court measures the legislation at issue in *Fry* in light of today's decision, although, as I have noted, that consideration amounts to a repudiation of the Court's holding. See *supra*, at 872. Just as the reasoning of *Wirtz* is rejected, however, the reasoning of *Fry*, decided only last Term, must also be deemed rejected, for it adhered totally to the principles of *Wirtz*. That the Economic Stabilization Act was an emergency measure was not dispositive in *Fry*; it merely rendered the Act "even less intrusive" than the "quite limited" legislation sustained in *Wirtz*. 421 U. S., at 548.

eral interests being silently balanced, as in the discussion of *Fry, ante,* at 853? The best I can make of it is that the 1966 FLSA amendments are struck down and *Wirtz* is overruled on the basis of the conceptually unworkable essential-function test; and that the test is unworkable is demonstrated by my Brethren's inability to articulate any meaningful distinctions among state-operated railroads, see *ante,* at 854–855, n. 18, state-operated schools and hospitals, and state-operated police and fire departments.

We are left then with a catastrophic judicial body blow at Congress' power under the Commerce Clause. Even if Congress may nevertheless accomplish its objectives—for example, by conditioning grants of federal funds upon compliance with federal minimum wage and overtime standards, cf. *Oklahoma* v. *CSC,* 330 U. S. 127, 144 (1947)—there is an ominous portent of disruption of our constitutional structure implicit in today's mischievous decision. I dissent.

MR. JUSTICE STEVENS, dissenting.

The Court holds that the Federal Government may not interfere with a sovereign State's inherent right to pay a substandard wage to the janitor at the state capitol. The principle on which the holding rests is difficult to perceive.

The Federal Government may, I believe, require the State to act impartially when it hires or fires the janitor, to withhold taxes from his paycheck, to observe safety regulations when he is performing his job, to forbid him from burning too much soft coal in the capitol furnace, from dumping untreated refuse in an adjacent waterway, from overloading a state-owned garbage truck, or from driving either the truck or the Governor's limousine over 55 miles an hour. Even though these and many other

activities of the capitol janitor are activities of the State *qua* State, I have no doubt that they are subject to federal regulation.

I agree that it is unwise for the Federal Government to exercise its power in the ways described in the Court's opinion. For the proposition that regulation of the minimum price of a commodity—even labor—will increase the quantity consumed is not one that I can readily understand. That concern, however, applies with even greater force to the private sector of the economy where the exclusion of the marginally employable does the greatest harm and, in all events, merely reflects my views on a policy issue which has been firmly resolved by the branches of government having power to decide such questions. As far as the complexities of adjusting police and fire departments to this sort of federal control are concerned, I presume that appropriate tailor-made regulations would soon solve their most pressing problems. After all, the interests adversely affected by this legislation are not without political power.

My disagreement with the wisdom of this legislation may not, of course, affect my judgment with respect to its validity. On this issue there is no dissent from the proposition that the Federal Government's power over the labor market is adequate to embrace these employees. Since I am unable to identify a limitation on that federal power that would not also invalidate federal regulation of state activities that I consider unquestionably permissible, I am persuaded that this statute is valid. Accordingly, with respect and a great deal of sympathy for the views expressed by the Court, I dissent from its constitutional holding.