ETHEL GILBERT, APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF PUBLIC WELFARE, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 16, 1979—Decided March 1, 1979.

Before Judges CONFORD, PRESSLER and KING.

*Mr. W. Marshall Prettyman* argued the cause for appellant (Rutgers Legal Aid Clinic).

*Ms. Andrea M. Silkowitz,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Ms. Erminie L. Conley,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by
PRESSLER, J. A. D. This welfare case projects a novel issue concerning federal-state relations.

Congress in 1973 and as part of its anti-poverty efforts enacted 42 *U. S. C. A.* §§ 4951 *et seq.,* providing for a variety of domestic volunteer service programs including Volunteers In Service to America (VISTA). 42 *U. S. C. A.* §§ 4951 to 4958. The purpose of the VISTA program, as stated by 42 *U. S. C. A.* § 4951, is to

* * * strengthen and supplement efforts to eliminate poverty and poverty-related human, social, and environmental problems in the United States by encouraging and enabling persons from all walks of life and all age groups, including elderly and retired Americans, to perform meaningful and constructive volunteer service in agencies, institutions, and situations where the application of human talent and dedication may assist in the solution of poverty and poverty-related problems and secure and exploit opportunities for self-advancement by persons afflicted with such problems.

As one of the measures evidently designed to encourage individual participation in VISTA as well as the other designated domestic volunteer programs, 42 *U. S. C. A.* § 5044(g) provides that

220

> Notwithstanding any other provision of law except as may be provided expressly in limitation of this subsection, payments to volunteers under this chapter shall not in any way reduce or eliminate the level of or eligibility for assistance or services any such volunteers may be receiving under any governmental program.

New Jersey, in addition to its participation in such federally-funded public assistance programs as Aid to Families with Dependent Children (AFDC), Aid to Families of the Working Poor (AFWP), and Medicaid[1], also maintains its own program for the assistance of eligible needy persons not otherwise provided for. That program is encompassed by the General Public Assistance Law, *N. J. S. A.* 44:8-107 *et seq.*, which delegates initial responsibility therefor to the municipalities and which provides for its funding by way of local appropriations supplemented by state aid.[2] It receives no direct federal financial contribution. The administration of the program is governed by the General Assistance Manual, *N. J. A. C.* 10:85-1.1 *et seq.* Standards of financial eligibility of participants are prescribed by *N. J. A. C.* 10:85-3.3, which, by subsection (e)(1)(ii), provides that in calculating unearned income,

[1]State participation in AFDC and AFWP was originally provided for by *N. J. S. A.* 44:10-1 *et seq.*, and 44:13-1 *et seq.* By reason of federal revision of these programs *N. J. S. A.* 44:13-1 *et seq.* was repealed, effective July 1, 1977, and the AFWP program is now encompassed by the AFDC program pursuant to *N. J. S. A.* 44:10-1 *et seq.*, also amended effective that date. Participation in Medicaid is provided by *N. J. S. A.* 30:4D-1.

[2]*N. J. S. A.* 44:8-110 provides generally for state aid for general public assistance. *N. J. S. A.* 44:8-129 fixes assistance at 75% of the total cost. *N. J. A. C.* 10:85-6.2 further provides that the calculation of 75% shall exclude municipal costs for program administration. We are advised by the Division that for the year 1977, of a total general assistance expenditure of $45,579,392, the State assumed $31,845,000 and that for the year 1978, of a total general assistance expenditure of $49,666,693, the State assumed $35,163,060.

Income in the form of benefits, grants or earnings received from any Federal bureau or agency must be applied in computing the amount of the eligible unit's grant.

The appellant here had been, prior to September 1977, a recipient of a monthly grant of $82 under the General Assistance Program. In September 1977 she joined VISTA, was assigned to work at the Newark Justice Program and received a bi-weekly federal stipend of $145.85. The following month she was advised by the Newark Municipal Welfare Department that her general assistance benefits would be terminated because her receipt of the VISTA stipend caused her monthly income to exceed the level of eligibility for general assistance. She contested that determination on the ground that the proscription of 42 *U. S. C. A.* § 5044(g) would be thereby violated. That decision was nevertheless subsequently affirmed both by the City of Newark and the Division of Public Welfare (Division), both of which relied on *N. J. A. C.* 10:85–3.3(e)(1)(ii) and concluded that since the General Assistance Program received no reimbursement or contribution of funds by the Federal Government, the federal statute respecting the consequence of VISTA stipends was inapplicable.[3]

The first question thus posed by the apparent conflict between 42 *U. S. C. A.* § 5044(g) and *N. J. A. C.* 10:85–3.3 (e)(1)(ii) is whether Congress in enacting the former intended by its use of the phrase "any governmental program," to extend the proscription of that provision to states and their political subdivisions in respect of local welfare programs receiving no federal financial assistance. The second question is whether such a construction of 42 *U. S. C. A.* § 5044(g) would render it violative of the state's

---

[3] *N. J. S. A.* 44:10–3(c) expressly provides in respect of AFDC that in determining eligibility "the amounts of income and resources required by Federal law as a condition of Federal financial participation" shall be disregarded.

right of sovereignty to the extent guaranteed by the Tenth Amendment of the United States Constitution. We are persuaded that the first of these questions must be answered in the affirmative and the second in the negative.

■ With respect to the statutory construction question, we are unable to discern any basis, either in text, legislative history or congressional intent, which would justify the Division's contention that the phrase "any governmental program" should be limited to those programs of the States and their political subdivisions receiving direct federal funding. To the contrary, such a construction would violate the plain meaning of this entirely unambiguous phrase and the context in which it is used. It would undermine the express policy predicate of the VISTA program which is to encourage persons living at a poverty level to perform personally and socially meaningful community volunteer service without prejudice to their receipt of those very welfare benefits upon which their subsistence depends. Clearly the financial source of those welfare benefits is, in terms of the program concept, an irrelevant factor. Furthermore, such a limitation would contravene the available direct indications of legislative intent as contained in the Report of the Senate, Labor and Public Welfare Committee, which explained inclusion of 42 *U. S. C. A.* § 5044(g) as a technique to assure

* * * low-income VISTA *community volunteers that their* VISTA allowances and stipends will not have the effect of reducing or eliminating their or their families' level of eligibility for assistance or services, such as Medicaid, received under any other governmental program *at any governmental level.* [S. Rep No. 93–311, 93d Cong., 1st Sess., reprinted in [1973] *U. S. Code Cong. & Admin. News,* pp. 2155, 2181; emphasis supplied]

And the Senate report further declares that

* * * in keeping with the volunteer concept of the program * * * as to * * * community low-income volunteers in VISTA and VISTA-type programs, no support payments or services shall in any way effect their eligibility for pension, social security, Medicare, Medi-

caid, Public Assistance, or other governmental benefits to which they are entitled (such as housing and food stamps). [*Id.* at 2161]

The contrary interpretation by that federal agency directly charged with administration of the VISTA program, namely ACTION, further persuades us that the Division's contention is untenable 42 *U. S. C. A.* §§ 5041–5062. Thus, the VISTA Handbook, paragraph 50(b) at 51, provides that

It is ACTION policy, based on the legislative history of Section 404(g) [42 *U. S. C. A.* 5044(g)] and the most reasonable interpretation of its language, that it is designed to insure that persons and families of persons receiving benefits (assistance or services) under any Federal, State, or local governmental program *prior* to entering ACTION volunteer service do not lose these benefits as a result of volunteer service. For example, former welfare recipients who enter VISTA will not have their VISTA allowance and stipend counted to determine whether they are still eligible for welfare benefits for their dependents. [Emphasis is the Agency's]

Having concluded that 42 *U. S. C. A.* § 5044(g) means precisely what it says and hence that it applies to a welfare program wholly financed by the state and its political subdivisions, we are satisfied, barring other constitutional impediment, that by reason of preemption vouchsafed by the Supremacy Clause, *U. S. Const.,* Art. VI, Cl.2, the federal statute clearly supersedes the contrary provision of the New Jersey general assistance regulation. See, *e. g., Perez v. Campbell,* 402 *U. S.* 637, 91 *S. Ct.* 1704, 29 *L. Ed.* 2d 233 (1971); *Free v. Bland,* 369 *U. S.* 663, 82 *S. Ct.* 1089, 8 *L. Ed.* 2d 180 (1962). The Division argues that the Tenth Amendment of the United States Constitution constitutes just such a constitutional impediment and urges us to regard 42 *U. S. C. A.* § 5044(g) as a violation thereof. We find, however, no offense to the Tenth Amendment in that statute even if it is as broad as we have construed it.

The Tenth Amendment, the so-called states' rights provision, reads in full as follows:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

In contending that the administration of a state-funded welfare program is a "reserved" power, not subject to congressional intrusion, the Division relies heavily on the recent and federally-restrictive opinion of the United States Supreme Court in *National League of Cities v. Usery*, 426 *U. S.* 833, 96 *S. Ct.* 2465, 49 *L. Ed.* 2d 245 (1976), which struck down, on Tenth Amendment grounds, federal legislation which would have required the states and their political subdivisions to comply, in respect of their own employees, with minimum wage laws. We regard the Division's reliance on that opinion as misplaced. We do not deem it necessary to engage in any extended discourse either of the original state-federal tensions which produced the Tenth Amendment or of the constructional history of that constitutional provision since in our view the restatement of Tenth Amendment principles in the majority opinion of *National League of Cities v. Usery, supra*, itself readily demonstrates that it is not here violated.

Thus, *National League of Cities* makes clear that the protective scope of the Tenth Amendment extends only to those attributes of state sovereignty which may not be impaired without impairing sovereignty itself. Those attributes are defined in terms of governmental functions essential to the separate and independent existence of the states. And those functions are, in turn, defined in terms of those activities in which the States individually, rather than the Federal Government, have traditionally engaged and those governmental services which are the states' assumed obligation to provide independently of the Federal Government. But, as the majority in *National League of Cities* further makes clear, it is not *any* degree of federal engagement in these functions and activities which will violate the reserved powers clause. Rather, the test of violation is engagement which has a "significant impact on the functioning" of state and local govern-

ment (426 *U. S.* at 846, 96 *S. Ct.* at 2465) and which in effect "displaces state policies regarding the manner in which they [the States and their political subdivisions] will structure delivery of those governmental services which their citizens require." 426 *U. S.* at 847, 96 *S. Ct.* at 2472. The perceived unconstitutional intrusion there was based upon the substantially increased cost of providing governmental services which would be occasioned by compliance with federal minimum wage standards and the consequent necessity of the States and their subdivisions to curtail the scope and intensity of those services.

In our view the federal impingement upon the New Jersey general assistance welfare program attendant upon its exemption of VISTA payments from income calculations is patently neither qualitatively nor quantitatively of such magnitude as to invoke the Tenth Amendment in aid of state sovereignty.

First, and perhaps most significantly, VISTA is not a program mandated to the states. Volunteers are assigned within a state only when the specific VISTA program has received gubernatorial approval, and termination of the program, once accepted, is subject to gubernatorial request. 42 *U. S. C. A.* § 4953(d). Acceptance of the VISTA program by New Jersey was not only, therefore, dependent upon the exercise of gubernatorial prerogative, but, further, local governmental units of this State have been encouraged to participate therein by act of the New Jersey Legislature. Thus *N. J. S. A.* 44:12–1, *et seq.,* enacted in aid of federal anti-poverty programs, of which VISTA is clearly one, specifically empowers local governmental units to make budgetary appropriations, enter into contracts and take such other actions as are necessary and convenient to facilitate their cooperation with the federal government in its anti-poverty efforts. *N. J. S. A.* 44:12–2. Having thus opted to cooperate with the Federal Government's VISTA program, this State's obligation thereto, so long as that option continues effective, is to accept it as formulated by the Federal Government. Obviously, our

acceptance cannot be either selective of its conditions or subversive of its import.

Furthermore, our acceptance of the program, far from imposing an obligation upon the State which impinges upon its own welfare delivery system, actually confers both direct and indirect benefits. First, the program provides a work force in the community which assists in the provision of governmental and social services.[4] The community at large also thereby receives the indirect and intangible benefits of enhancement of the quality of life which is implicit in the opportunity of the volunteers to perform useful work and to acquire work training which may serve to make them financially independent in the future. The only cost, if cost it is, which the State pays for these benefits is the preclusion of the opportunity to save the expenditure of general assistance funds which it would be in any case expending but for the VISTA program.

We are further satisfied that relief of the poor and needy, while historically and traditionally an exclusive state function within Tenth Amendment contemplation, has long since become a subject of state-federal partnership in which, at least in terms of fiscal responsibility, the Federal Government is the predominant contributor. We are, for example, advised by the Division that the total amount expended in 1978 for federally-funded assistance programs, including AFDC, emergency assistance thereunder, and assistance to Social Se-

---

[4]We are advised that there are presently 11 nonprofit community agencies served by VISTA volunteers, namely, Community Housing & Education Corporation (Newark) ; East Trenton Neighborhood Council Community Center (Trenton) ; Newark Justice Program (Newark) ; Puerto Rican Congress of New Jersey (Trenton) ; Narcotic Addicts Rehabilitation Center Organization (Atlantic City) ; Metropolitan Ecumenical Ministry (Newark) ; Architects Community Design Center (Newark) ; Montclair Child Development Center (Glen Ridge) ; Ironbound Community Corporation (Newark) ; Camden Regional Legal Services (Camden) ; Unified Vailsburg Service Organization (Newark).

curity income recipients, was just short of $485,000,000, of which the Federal Government paid just short of $335,000,000, or approximately 70%. By contrast, the total expenditure in that year for the General Assistance Program was just short of $50,000,000, a sum amounting to about 10% of the federal program total. With respect to the impact of the VISTA program on the General Assistance Program, we are advised that there is at present a total of 72 VISTA volunteers working in the State of New Jersey. While the parties hereto have been unable to advise us as to the number receiving any form of public assistance, we are nevertheless satisfied that even in the unlikely event that all were receiving General Assistance benefits, the cost impact of 42 *U. S. C. A.* § 5044(g) would be minimal.

In short, we regard the extent of federal financial participation in the totality of the welfare scheme as so pervasive and so substantial and so ultimately ameliorative of the State's traditional obligations in that area of governmental service as to compel us to conclude that the limited component of that scheme maintained by the State alone is not fairly regardable as the performance of a sovereign function immune under the Tenth Amendment from such federal intrusion which in absolute fiscal terms is not only insignificant but also compensated for by the conferring of positive benefits.

For the foregoing reasons we hold that 42 *U. S. C. A.* § 5044(g) is not constitutionally vulnerable and, therefore, preempts *N. J. A. C.* 10:85–3.3(e)(1)(ii).

The determination of the Division terminating appellant's general assistance grant is reversed and we remand for calculation of such benefits as she is entitled to under the General Assistance Law.

CONFORD, P. J. A. D. (retired, temporarily assigned, dissenting). I would not construe "any governmental program," as employed in 42 *U. S. C. A.* § 5044(g) (p. 220), as including a state welfare program which is not financially aided by

the Federal Government. The implications against congressional intent to interfere with state policy decisions in the area of state regulation of exclusively state-financed and administered welfare — traditionally a matter of state and local governmental concern[1] — are so impelling as to convince me that the intent of the federal legislation is not to go that far. While encouragement of the entry of the poor into VISTA is obviously the purpose of the provision in question, there is no apparent reason to suppose Congress had any desire to go beyond exempting VISTA compensation from application of criteria for qualification for aid under federal or federally aided state programs. I read the legislative history materials cited by the majority (p. 222) precisely to the contrary of the majority inference since the illustrative programs mentioned in the data are predominantly federal and none unambiguously solely of a state nature. *Noscitur a sociis.*

Moreover, the subject matter affected, under the majority conclusion, is so heavily fraught with danger of federal interference with exclusively state policy, contrary to Tenth Amendment considerations, that I would expect more explicit federal legislative language were the intent as the majority conceives it. See *National League of Cities v. Usery,* 426 *U. S.* 833, 96 *S. Ct.* 2465, 49 *L. Ed.* 2d 245 (1976); *Brown v. Environmental Protection Agency,* 521 *F.* 2d 827 (9 Cir. 1975), vac. and rem. 431 *U. S.* 99, 97 *S. Ct.* 1635, 52 *L. Ed.* 2d 166 (1977), on remand 566 *F.* 2d 665 (9 Cir. 1977); *District of Columbia v. Train,* 172 *U. S. App. D. C.* 311, 521 *F.* 2d 971 (D. C. Cir. 1975), vac. and rem. 431 *U. S.* 99, 97 *S. Ct.* 1635, 52 *L. Ed.* 2d 166 (1977), on remand, 186 *U. S. App. D. C.* 98, 567 *F.* 2d 1091 (1977).

I cannot agree with the majority (p. 225) that this State may be deemed to have waived the integrity of its own pertinent regulation with respect to General Assistance clients

---

[1] See *Bonnet v. State,* 155 *N. J. Super.* 520, 529 (1978), aff'd 78 *N. J.* 325 (1978).

by mere virtue of the failure of the Governor to have *disapproved*[2] any particular VISTA program in this State, as permitted by the statute. 42 *U. S. C. A.* § 4953(d). Such inaction by the state executive does not constitute affirmative action by the State, through the Legislative Branch, as our Constitution contemplates for effective and binding action by this State.

One can conceive any number of socially beneficial activities other than VISTA in which indigent people might be engaging for compensation which would be chargeable against them if they applied for General Assistance. Our local state policy to place compensated VISTA workers in the same relative position as all such otherwise employed people ought not to be held overruled by the ambiguous federal statute before us for construction in this case.

---

[2] The federal act does not require "approval" by the Governor as a condition of effectiveness of the program in a State. The Governor cannot terminate a VISTA program but can only request the discontinuance of the service of a "volunteer." 42 *U. S. C. A.* § 4953(d).