William L. CHILDERS, and all other
similarly situated employees of the
City of Eugene, Plaintiffs,

v.

CITY OF EUGENE, Defendant.

Civil No. 95–6021–TC.

United States District Court,
D. Oregon.

April 11, 1996.

John E. Hoag, Hoag, Garrettson &
Goldberg, Eugene, Oregon, for plaintiffs.

William F. Gary, Harrang, Long, Gary,
Rudnick, Eugene, Oregon, for defendant.

## AMENDED ORDER

COFFIN, United States Magistrate
Judge:

Plaintiffs are current and former employees of the City of Eugene who have filed this lawsuit to recover overtime compensation and liquidated damages, to which they contend they are entitled because of the City's disciplinary policies.

The City contends that these plaintiffs are not hourly wage earners, but that they are salaried employees and consequently not entitled to overtime pay.

As best as can be determined at this point in the proceedings, over $780,000 in damages is at stake in this controversy.

The legal issues presented involve complexities which arise under the Fair Labor

Standards Act (FLSA) and applicable case law, but can be summarized as follows:

The twenty-four plaintiffs in this action all functioned as supervisors for the City of Eugene, and were all treated as salaried employees and thus exempted from overtime pay under the FLSA. However, during the last ten years, the City suspended two of its salaried employees without pay for less than a week, and these actions plus the potential for such discipline raises the question of whether the City has run afoul of the FLSA and thus must compensate the plaintiffs as if they had been hourly wage-earners.

The City contends that this case involves profound questions of the relationship of the federal government to state and local municipalities. In order to fully understand the City's position, it is helpful to trace the background of these plaintiffs in more detail, the actual disciplinary actions taken by the City, as well as to juxtapose the realities of this case with the purpose and requirements of the FLSA.

### A. Plaintiffs

There are currently 358 "exempt" employees (i.e., executive, administrative, and professional employees) working for the City of Eugene. Twenty-one (not including three former such employees) have opted to be plaintiffs in this action. One plaintiff is employed in the Library, Recreation and Cultural Services Department, and the other twenty in the Police Service, Fire and Emergency Service, or Administrative Service.

Within the Police Department, two of the plaintiffs are Lieutenants, while eight are Sergeants.

Within the Fire and Emergency Department, seven of the plaintiffs are either District or Battalion Chiefs, and one is the Emergency Medical Services Program Manager.

In Administrative Services, one plaintiff is the Police Training Officer and another is the Fire Training Officer.

The final current City employee plaintiff is the Recreation Facility Supervisor for the Library, Recreation and Cultural Services Department.

The three former employees consist of two ex-sergeants in the Police Department, and a past District Chief in the Fire Department.

Plaintiffs concede that all of the above employees qualified as "salaried" employees pursuant to their supervisorial and executive duties, and the critical issue in this case is whether the City's disciplinary policies result in their being nonetheless classified as hourly wage-earners.

### B. Disciplinary Action and Policy by the City

In June, 1993, one of the plaintiffs, an unidentified patrol sergeant, was suspended without pay for two days because he failed to respond as directed to a reported injury traffic accident at a Eugene intersection.

On October 8, 1993, a Public Works Supervisor, not a plaintiff in this action, was suspended for four hours without pay for performance and attendance problems.

In early 1995, these two employees were reimbursed by the City for the dock in pay caused by their suspensions.

Only one other exempt employee has been suspended without pay in the last ten years—a Parks and Recreation Supervisor, not a plaintiff in this action, who was suspended in 1991 for one week. However, this disciplinary action does not violate the FLSA exempt status because suspensions in one-week increments are permissible. See 29 C.F.R. § 541.118(a) ("employee need not be paid for any workweek in which he performs no work").

Thus, there have been only two actual disciplinary actions taken by the City in a ten year period that arguably undermine the salaried status of the City's exempt employees. Based on these actions, plaintiffs contend that they are entitled to overtime pay because they were "subject to" the possibility of having their pay docked for less than one-week for less than major safety rule infractions.

### C. The FLSA

The FLSA mandates that employees who work in excess of forty hours in a week

receive overtime compensation at a rate not less than one and one-half times their regular hourly wage. 29 U.S.C. § 207(a)(1).

The mandate applies to hourly wage earners. The FLSA exempts from its provisions "any employee employed in a bona fide executive, administrative, or professional capacity ..." 29 U.S.C. § 213(a)(1).

But who is a "bona fide" executive, administrator, or professional? The FLSA directs the Secretary of Labor to define these terms "from time to time by regulations." § 213(a)(1).

The regulations, in turn, establish a "duties" component and a "salary basis" test to define the "bona fide"—and therefore "exempt"—executive, administrator, and/or professional.

The "duties" analysis is set forth in 29 C.F.R. § 541.1 (executive), § 541.2 (administrative), and § 541.3 (professional). Plaintiffs agree that each of them satisfies the duties test for exempt employees.

The bone of contention in this case is whether the City violated the "salary basis" test through its disciplinary actions and policy as described above.

The salary basis test is set forth at 29 C.F.R. § 541.118. In pertinent part, the regulation reads as follows:

§ 541.118 Salary basis.

(a) An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.

. . . .

(5) Penalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried status. Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines.

This is not the first time the salary basis test has been challenged by a public employer.

In *Service Employees International Union Local 102 v. San Diego,* 35 F.3d 483 (9th Cir.1994), as amended 60 F.3d 1346 (9th Cir. 1994), the court declared the salary basis test as it existed prior to September 6, 1991, as applied to the public sector, invalid because the test was "out of harmony" with congressional intent. 60 F.3d at 1350–54.

The infirmity of the salary basis test as set forth in *SEIU* concerned the pre–1991–92 regulatory requirement that public sector employees be paid for a full day's work even if they were on the job for less than a full day. Since virtually all local and state governments used pay systems based on "public accountability" [the notion that governmental employees not be paid for time not worked due to the need to be accountable to the taxpayers], most public employers could not satisfy the salary test as it existed prior to September 6, 1991.[1]

The City of Eugene argues that this case, if not on all fours with *SEIU,* at least falls within its shadow.

A question presented is whether the DOL's failure to carve out an exception for the docking of pay of public sector employees as a disciplinary measure invokes similar infirmities with the current salary basis test regulations.

---

1. The DOL suspended application of the regulation to public sector employees on September 6, 1991, and on August 19, 1992 revised the regulation to provide that "[a]n employee of a public agency who otherwise meets the requirements of § 541.118 shall not be disqualified from exemption ... on the basis that such employee is paid according to a pay system ... established pursuant to principles of public accountability."

The court addresses this question with minimal input from the agency (DOL) which Congress has directed to define and delimit the bona fide exempt employees.

When the DOL revisited its salary basis test as applied to the public sector, it made the following observations about the "no docking" rule:

> Several commenters (Arnstein & Lehr on behalf of the City of Naperville, IL; County Attorney, Fulton County, GA; Fisher & Phillips) stated that disciplinary situations are unique in the public sector, particularly in organizations like police departments, or different from those of the private sector because public employers have less freedom to terminate employees absent extraordinary circumstances and thus must use disciplinary suspensions without pay to rehabilitate or control behavior; that public employers have virtually no other penalty options; and that suspension for a full week, which can be done without jeopardizing exempt status, is rarely imposed because of its severity. One commenter (County Attorney, Dade County, FL) suggested that disciplinary systems promulgated by statute, ordinance, administrative order, standard procedure, or collective bargaining should be treated in the same manner as the new regulation treats deductions for partial-day absences. One commenter (Fisher & Phillips) noted that such disciplinary systems were in place at the time of the *Garcia* decision and are premised on the concept that public employers should be accountable to the taxpayers for the conduct of public employees. Another commenter (City of Norfolk, VA) stated that failure to allow disciplinary deductions in the case of exempt employees could result in inconsistent application of discipline among exempt and non-exempt employees.
>
> In the Department's judgment, the comments have not suggested a sufficient basis for distinguishing between the public and private sectors with respect to any recommended change in the rule. Although contrary assertions were made, the comments failed to demonstrate that public employers are significantly more restricted in the availability of options with respect to employee discipline than private employers. Although public employee terminations may require compliance with procedures designed to protect employee rights, termination for disciplinary reasons is not generally unavailable. In addition, other remedies for disciplinary infractions, such as official reprimands, demotions, and reassignment or restriction of duties, are generally available and used in the public sector.
>
> Section 541.118(a)(5) was not open for comment during the present rulemaking. *However, the Department expects to consider this issue as appropriate in proposed revisions of Part 541 at a later date.*

57 Fed.Reg. 37666, 37674 (emphasis added).

The "later date" has yet to arrive. In the meantime, we are left with a Department interpretation to the effect that there is no sufficient basis to distinguish the public and private sectors with respect to employee discipline.

However, § 541.118(a)(5) does not seem a neat fit for the public sector situation. To repeat that exception to the "no docking" rule:

> Penalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried status. Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines.

Unlike the private sector, public sector employees are often charged with safeguarding the general public. What sense does it make to allow an exempt employee's pay to be docked as a disciplinary measure for throwing a lit cigarette into a wastebasket at an elementary school because it might endanger "the plant," but not because it might endanger the students? Or—more to point here—to permit the docking of a patrol sergeant's pay for failing to respond to a traffic accident if such failure endangered another public sector employee, or perhaps his equipment, but not if it only endangered the victim or the public at large?

■ Thus, a threshold question is presented as to whether the suspension of the Patrol Sergeant ran afoul of the salary basis test. The issue is whether his pay [and those of the other plaintiffs] was "subject to reduction because of variations in the quality or quantity of the work performed," as evidenced by the City docking him two day's pay for the incident, or whether his suspension was a "penalt[y] imposed in good faith for [an] infraction of [a] safety rule of major significance."

Assuming, *arguendo,* the City is limited in disciplining violations of "major safety rules" to those infractions which endanger co-workers or company facilities and equipment,[2] I find that the discipline of the unresponsive sergeant falls within that which is permissible under this exception to the no docking rule. A Patrol Sergeant's failure to respond to a traffic accident injury situation could well endanger medics and other public safety colleagues who are thus deprived of the Sergeant's supervision and assistance in routing traffic around the accident while they administer aid, in clearing the roadway of obstructed vehicles, or in performing other emergency functions. I reject plaintiff's contention that the disciplinary report of this incident reveals no such safety infractions. To the contrary, a reasonable review of the report reveals that the City did view the Sergeant's infraction as one which potentially endangered his co-workers:

> The last issue comes down to your failure to respond as a police officer to a reported injury accident at 33rd and Hilyard. You have claimed that you did not need to respond to the accident because you assumed EMS/Fire apparatus was en route from 33rd and Donald and that as a supervisor you need not respond. You also claim that "intuition" told you that it was not a serious accident because dispatch didn't look for the nearest car. In your memo of May 29th you state "... I had every reason to believe that the district 3 car was available and not dispatched because of the availability of other units that would not require overtime should an investigation be necessary." ... The only

facts available to you at that moment were you were the closest police unit available, a head injury had been reported and fire was en route. In that situation, any available UNIFORMED PATROL OFFICER who is closer than the assigned officer should respond to the scene. To protect and assist the public *and fellow emergency responders is a fundamental duty of police officers. Failure to respond is a serious violation.*

(emphasis added).

■ The remaining act of discipline which allegedly violates the salary basis test is the docking of four hours pay for a public works supervisor. The defendant concedes that this disciplinary action did not concern a "major safety violation."

Here, the City's argument divides: it mounts both a full blown frontal assault on the no-docking rule as applied to public sector employees, and as an alternative, falls back on the "window of correction" exception for "inadvertent" violations of the rule.

Taking the latter contention first, § 541.118(a)(6) provides as follows:

> The effect of making a deduction which is not permitted under these interpretations will depend upon the facts in the particular case. Where deductions are generally made when there is no work available, it indicates that there was no intention to pay the employee on a salary basis. In such a case the exemption would not be applicable to him during the entire period when such deductions were being made. On the other hand, where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

Plaintiffs vigorously contend that this "window" is firmly closed against the City, relying on *Abshire v. County of Kern,* 908 F.2d 483 (9th Cir.1990).

---

**2.** *See Avery v. City Talladega,* 24 F.3d 1337, 1341      (11th Cir.1994).

In *Abshire,* the court interpreted § 541.118(a)(6) as follows:

Where there is an occasional deduction made because of an error on the part of a government entity or because of an individual decision by a supervisor, there is good reason to say that the affected employee's status will be changed only for the week in which the unpermitted deduction was made. *Cf.* § 541.118(a)(6) (where individual error made and corrected). But where an employer deliberately adopts a policy rendering employees' pay *"subject to"* deductions for unpermitted reasons, the frequency with which an employer is forced to apply that policy is irrelevant. If there is any cause to determine the frequency with which an employer makes unpermitted deductions, it is only to help in determining whether such a policy exists (causing the Department to "question whether the employee is actually paid 'on a salary basis' "). Here there is no question that the County's policy provides for such deductions.

. . . .

Once again, the thrust behind the regulations is to facilitate the determination whether an employer has a general policy of deducting for absences of less than a day or whether a deduction is made as a result of inadvertence or error. The exception in subsection (6) is for an employer that makes a one-time improper deduction and then corrects its error.

*Id.* at 488–89.

According to plaintiffs, the record establishes as a matter of law that the City deliberately chose to subject its otherwise exempt employees to a policy of disciplinary measures that included pay-docking for periods of less than a week, and thus the "inadvertence" exception is inapplicable. I do not agree.

One of the incidents relied upon by plaintiffs to argue that the City deliberately chose to subject its employees to a policy of prohibited disciplinary measures is that of the sergeant who failed to respond to a traffic accident, as discussed previously. Based on my finding that this was an infraction involving a major safety rule, however, the imposed discipline did not violate the salary basis test.

The other incident relied upon by plaintiffs is the four hour suspension of the public works supervisor. That incident begs the question—was this a deliberate choice of forbidden fruit or "error on the part of a government entity"?

Plaintiffs also point to the failure of the City to expressly eschew in its written policies—prior to May, 1994—any pay docking of exempt employees which would be violative of the salary basis test.

But the absence of such qualifying language does not establish, by negative implication, the existence of the policy at issue. Just as a litany of caveats in the City's written policies would not save it if, in actual practice, it docked the pay of its salaried exempt employees in a manner that violated the salary basis test, so the lack of an express prohibition does not condemn it, if, in actual practice, it complied with the FLSA.

As previously noted, the disciplinary practice of the City over the past ten years has been almost without exception in conformity with the salary basis test. The lone exception involves the four hour suspension of the Public Works Supervisor.

Far from establishing that the City deliberately subjected its exempt employees to a policy of FLSA-prohibited disciplinary practices, the record permits only one reasonable conclusion: the City attempted at all times to steer a course that was in compliance with the FLSA, through a regulatory sea that was not well-charted for the public employer.

To elaborate, prior to May 23, 1994, the City's policies had been written broadly to cover all City regular employees, both FLSA exempt and non-exempt, union and non-union members. The policies applied to all employees up to the highest level of management.

Although the City's written policy regarding discipline provided for "progressive" discipline which included suspension without pay, it did not specify the length of such a sanction for any particular infraction. As previously noted, the FLSA allows for suspension without pay of an exempt employee in one week increments for disciplinary rea-

sons,[3] and for suspensions of less than one week for violations of "major safety rules."

In July, 1993, a City official, Sharon Meckley, who was responsible for FLSA-compliance issues, questioned whether written changes in the City's discipline policy needed to be made in light of a recent Seventh Circuit case, *Klein v. Rush–Presbyterian–St. Luke's Medical Center*, 990 F.2d 279 (7th Cir.1993) (holding, in part, that the "no-docking" rule was valid and that improper disciplining of a nurse destroyed the exemption). The City's Human Resource and Risk Services (HRRS) management group considered that the *Klein* case was from outside the Ninth Circuit, that there were no Ninth Circuit cases yet on the issue, and that the case involved a private employer, not a public entity. The management group accordingly decided to monitor the issue, but continued to believe it was in compliance with the FLSA.

Subsequently, other cases in other circuits which were consistent with *Klein* came to the attention of the HRRS management group. In conjunction with legal counsel, the group decided to expressly provide in its written policy that FLSA exempt employees would not be subject to disciplinary pay-docking for less than one week increments, except for violations of major safety rules.

In the meantime, in October, 1993, the Parks Supervisor was improperly suspended for four hours. The City erred, but it erred because of an honest yet mistaken belief that it could discipline this employee without violating the FLSA.

In June, 1994, *Hurley v. State of Oregon*, 27 F.3d 392 (9th Cir.1994), was decided. For the first time, the Circuit addressed some of the issues at the heart of this case—e.g.,

disciplining of FLSA exempt public sector employees.

As the case law develops, even this Circuit has drastically altered course.

In *Abshire*, decided in 1990, which plaintiffs ironically rely upon to counter the City's "window of correction" argument, the court held that pay deductions for absences of less than one day were not permitted under the salary basis test, and that a public employer lost its exemption for doing so and was not entitled to the "inadvertent error" exception.

But in *SEIU*, decided in 1994 (after *Hurley*), the court held that the salary basis regulation was invalid in its entirety prior to September, 1991 because the DOL had failed to factor "public accountability" into its regulatory scheme, and that such accountability mandated that public sector employers be allowed to dock the pay of its exempt employees for absences of less than a day.

In effect, then, *SEIU* determined that *Abshire* had been wrongly decided: The employer there was actually in the right. Yet the "window of correction" regulation was of no avail there, and this wrongly-decided case is used as precedent that it should be of no avail here.

Common sense should have some application to what we do as judges. Should the DOL regulations be viewed as a minefield[4] for the well-intentioned, but understandably confused, employer who thinks its policy is in conformity with the FLSA, but subsequently learns it may not be and acts promptly to bring it into compliance? Put another way, is the "window of correction" only open to an employer who misinterprets its own policy [and thus does not "deliberately" choose a policy which does not conform to the FLSA], but not to an employer who reasonably mis-

---

3. It is somewhat puzzling that the DOL in effect encourages more severe pay docking sanctions against exempt employees than an employer might otherwise choose to impose for disciplinary reasons. This "one week or nothing approach," as well as the equally bizarre limitation of "major safety rules" to violations endangering co-workers and the plant, excluding dangers presented to the public served by the employee, only underscores the need for the DOL to clarify these regulations for public sector employers.

4. It is noteworthy that plaintiffs contend that the City also violated the salary basis test because Sergeant Childers' supervisor recommended that he be disciplined for non-safety rules infractions by having two days of accrued vacation time taken away. Not only was the recommendation *not* followed, a DOL opinion letter dated March 30, 1994 stated that such discipline "would not affect the salary basis of payment." Yet, plaintiffs argue that the opinion letter is in error, and thus that employers may even be lured into the minefield by the DOL.

interprets FLSA policy, and thus "inadvertently" takes a course that does not conform to the FLSA?

Another question is presented by plaintiffs' insistence that the court interpret the regulation strictly, to strip the City of its exemption: does the mis-step by the defendant in this lone incidence of improper employee discipline over a ten year period really mean that these plaintiffs—managers, fire chiefs, police lieutenants and sergeants, as well as all similarly situated potential plaintiffs who have not opted to join the case [as of yet]— were not "bona fide" salaried executives, administrators, and/or professionals, as opposed to hourly wage-earners? As Chief Judge Posner observed in *Mueller v. Reich,* 54 F.3d 438, 443 (7th Cir.1995):

> How, it might be asked, does the structure of discipline affect the character of employers as hourly or salaried workers? The only answer that has been suggested or that occurs to us is that if an employer measures out the discipline in the form of fractions of a weekly salary, the implication is that the employee is really being paid on an hourly basis. This is pretty feeble.

No rational person would conclude, from a four hour suspension of one exempt employee over a ten year period, that all of the City's executive and management employees were really hourly wage earners instead of salaried employees.

The draconian effect on the City from a slavishly rigid reading of the DOL regulations is enormous: A fraction of its exempt employees is seeking over $780,000 in "overtime" and liquidated damages. Were all eligible employees to join in this or other future lawsuits, the price to the City government for a four hour suspension gaffe would easily be in the millions.[5]

As further evidence of the City's good faith confusion, one needs only to look to the

history of the FLSA's application to the public sector. Prior to 1974, Congress had not extended the FLSA to public sector employees. The FLSA amendment of 1974 extended coverage to all public sector employees. Two years later, the Supreme Court held that the FLSA could not be applied to state and local governments. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In 1985, the Supreme Court overruled *Usery. Garcia v. San Antonio Metro. Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). That same year, in response to the *Garcia* decision, Congress again amended the FLSA to make adjustments with respect to public sector employees and to defer the effective date of certain provisions of the FLSA.

The legislative history of the 1974 and 1985 amendments to the FLSA indicates that Congress intended public sector supervisory employees to be exempt from the FLSA overtime requirements. *See SEIU,* 60 F.3d at 1351; *Stewart v. City and County of San Francisco,* 834 F.Supp. 1233, 1237 (N.D.Ca. 1993), *aff'd without opinion,* 69 F.3d 545 (9th Cir.1995). In 1974 Congress said:

> Section 6 of the bill extends minimum wage and overtime coverage to about 5 million *non-supervisory* employees in the public sector not now covered by the [FLSA].... The bill will provide that virtually all *non-supervisory* government employees will be covered.... By the same token, the committee intends to cover all employees (*except professional, executive, and administrative personnel who are exempted under section 13 of the law*) in all civilian branches of the Federal Government.[6]

H.R.Rep. No. 93–913, 93rd Cong. 2d Sess. 27 1974, *reprinted in* 1974 U.S.C.C.A.N. 2811, 2821. (emphasis added).

---

5. The affidavits submitted by the plaintiffs are revealing: two plaintiffs seek nearly $34,000 in overtime payments for "working at home" on projects. Of course, the City's belief that these were salaried employees kept it from monitoring such off premise work, from requiring prior approval for such work, or from requiring work-at-home executives to turn in time-slips, etc.

6. "The 1974 amendment did not otherwise define 'non-supervisory employees,' so we assume Congress must have been referring to those not exempt under the executive and administrative exemption." *SEIU,* 60 F.3d at 1351.

Furthermore, in 1985 Congress underscored its concern for the needs of state and local governments:

"[I]t is essential that the particular needs and circumstances of the States and their political subdivisions be carefully weighed and fairly accommodated. As the Supreme Court stated in *Garcia*, "the States occupy a special position in our constitutional system." Under that system, Congress has the responsibility to ensure that federal legislation does not undermine the States' "special position" or "unduly burden the States." In reporting this bill, the committee seeks to discharge that responsibility and to further the principles of cooperative federalism."

S.Rep. No. 159, 99th Cong., 7 (1985), *reprinted in* 1985 U.S.C.C.A.N. 651, 655.

While Congress was clear that the § 213 exemption was available to the public sector, it was silent as to whether the 1954 salary basis test and, more specifically, the "no docking" rule should apply. *SEIU*, 60 F.3d at 1351.

From 1985–1991, the DOL applied the salary basis test [formulated when only private sector employers were subject to the FLSA] to deprive public sector employers of exemptions if salaried employees were docked pay for being absent from work for less than a day. Before September, 1991, when the DOL suspended the application of the rule to the public sector, *Abshire* was decided, upholding the no docking rule for absenteeism against a public employer. But then the DOL determined that "public accountability" considerations allowed public sector employers to dock exempt employees' pay for hours not on the job. Thereafter, *SEIU* was decided, holding that the salary basis test had been invalid in its entirety [as applied to the public sector] prior to September, 1991.

The above experience with the part of the "no docking" rule concerning absenteeism by exempt public employees raises legitimate questions with the other part of the rule that is at the core of this case—i.e., the prohibition against suspending employees for periods of less than one week for other than major safety infractions. Given the history of the FLSA's application to state and local governments and the City's reasonable need for further clarification from the agency charged with defining who is a salaried government employee and who is not, the DOL's promise "to consider this issue as appropriate in proposed revisions of part 541 at a later date" is of little benefit.

In *Auer v. Robbins, Member of City of St. Louis Board of Police Commissioners, et al.*, 65 F.3d 702 (8th Cir.1995), the court interpreted the "window of correction" regulation as follows:

A one-time deduction, however, does not automatically require the determination that all sergeants are nonsalaried. The regulations provide for a "window of correction" and state that "[t]he effect of making a deduction which is not permitted under these interpretations will depend upon the facts in the particular case." 29 C.F.R. § 541.118(a)(6). The regulations further state that if "a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future." *Id.* In other words, "the 'window of correction' allows employers to treat otherwise eligible employees as salaried, regardless of the employee's one-time or unintentional failure to adhere to § 541.118(a)'s requirements." [citation and footnote omitted]. The "window of correction" is not available if the employer has a settled policy of making improper deductions from compensation. Under the unique circumstances surrounding Sergeant Guzy's disciplinary loss of pay, we believe that the department made one-time deduction, and did not make the disciplinary deduction from Sergeant Guzy pursuant to an established policy.

The record here is even more compelling than in *Auer*. This case involves a one-time and decidedly unintentional failure to adhere to § 541.118(a)'s requirements. The City tried to steer a compliant course as the case law and regulations directed it, and had legitimate questions about distinctions between public and private sector employees. Under

the circumstances of this case, the City is entitled to the "window of correction." The improperly disciplined employee has been reimbursed, and the City's policy has been clarified to reflect full compliance with the FLSA in the future.

■ As mentioned, defendant also mounted a frontal assault on the salary basis test— i.e., the City contends it is invalid because it is arbitrary and capricious. Under the Administrative Procedure Act, a court reviewing agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Since Congress has not directly spoken on the issue of the no docking regulation, the question before the court is whether the agency's formulation of the rule is based on a permissible construction of the statute. See Chevron, U.S.A., Inc., v. Natural Resources Defense Council, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The salary basis test, including the no docking rule, was developed long before the FLSA applied to public sector employees. As stated above, the Ninth Circuit found the entire salary basis test invalid as applied to the public sector prior to September 1991, when the DOL suspended application of a portion of the test to the public sector. When the DOL revised the salary basis test [as applied to the public sector] in 1992 it stated that the no docking rule "was not open for comment during the present rulemaking. However, the Department expects to consider the issue as appropriate in proposed revisions of Part 541 at a later date." As noted, that later date has yet to come. But Congress has directed the Secretary of Labor to define employees who are exempt from the FLSA from time to time by regulations. An agency's regulations are entitled to judicial deference only when they are the result of engaged interpretation of the statute. SEIU, 60 F.3d at 1356.

It may well be that the agency's failure to open up for comment the disciplinary application of the no docking rule following the "sea change"[7] caused by the extension of the FLSA to public employers affects the deference to be afforded this aspect of the salary basis test.[8] However, this court need not address the issue because of my finding that the City's one-time docking of an exempt employee's pay for disciplinary reasons fell within the "window of correction" exception. Furthermore, as this court noted in Quillin v. State of Oregon, Civil No. 94–6317–TC, to so hold would necessarily mean that Hurley was wrongly decided, or that it would be decided differently in the wake of SEIU. If Hurley needs to be revisited in light of SEIU and the City's argument that the regulation continues to be "out of harmony with congressional intent," that is a task that I happily leave to the Ninth Circuit.

### CONCLUSION

For the reasons set forth, defendant City of Eugene's motion (# 57) for summary judgment is granted and plaintiffs' motion (# 60) for summary judgment is denied. This case is dismissed.

---

**7.** See SEIU, 60 F.3d at 1356.

**8.** See Chevron, 467 U.S. at 863–64, 104 S.Ct. at 2792 ("[T]o engage in informed rulemaking, [an

agency] must consider varying interpretations and the wisdom of its policy on a continuing basis.")